CBS BROADCASTING INC.; Fox Broadcasting Co.; Group W/CBS Television Stations Partners, CBS Television Affiliates Association; Post–Newsweek Stations Florida, Inc.; KPAX Communications, Inc.; LWWI Broadcasting, Inc.; and Retlaw Enterprises, Inc., Plaintiffs,

v.

**PRIMETIME 24 JOINT VENTURE,** Defendant.

No. 96–3650–CIV.

United States District Court, S.D. Florida.

Dec. 23, 1998.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, Lawrence A. Kasten, Wilmer Cutler & Pickering, Washington, DC, Thomas P. Olson, Wilmer Cutler & Pickering, Washington, DC, Jonathan C. Drimmer, Covington & Burling, Washington, DC, Natacha Steimer, James Wrathall, Wilmer Cutler & Pickering, Washington, DC, Jay T. Smith, Covington & Burling, Washington, DC, for CBS, Inc.

Natacha Steimer, James Wrathall, Wilmer Cutler & Pickering, Washington, DC, Jay T. Smith, Covington & Burling, Washington, DC, for Fox Broadcasting Co.

Neil K. Roman, Covington & Burling, Washington, DC, Michael X. Imbroscio, Covington & Burling, Washington, DC, Jonathan R. Galst, Covington & Burling, Washington, DC, Natacha Steimer, James Wrathall, Jay T. Smith, Covington & Burling, Washington, DC, for CBS Television Affiliates Association.

Neil K. Roman, Michael X. Imbroscio, Jonathan R. Galst, Natacha Steimer, James Wrathall, Jay T. Smith, Covington

& Burling, Washington, DC, for Post–Newsweek Stations Florida Inc.

Neil K. Roman, Michael X. Imbroscio, Jonathan R. Galst, Natacha Steimer, James Wrathall, Jay T. Smith, Covington & Burling, Washington, DC, for KPAX Communications, Inc.

Neil K. Roman, Michael X. Imbroscio, Jonathan R. Galst, Natacha Steimer, James Wrathall, Jay T. Smith, Covington & Burling, Washington, DC, for LWWI Broadcasting, Inc.

Neil K. Roman, Michael X. Imbroscio, Jonathan R. Galst, Natacha Steimer, James Wrathall, Jay T. Smith, (See above), for Retlaw Enterprises, Inc.

Natacha Steimer, Wilmer Cutler & Pickering, Washington, DC, James Wrathall, Wilmer Cutler & Pickering, Washington, DC, for all plaintiffs.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, for ABC, Inc.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, for ABC Television Affiliates Association.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, for FBC Television Affiliates Association.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, for National Broadcasting Company.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, for NBC Television Affiliates.

Brian F. Spector, Kenny Nachwalter Seymour Arnold Critchlo, Miami, FL, Andrew Z. Schwartz, Foley Hoag & Eliot, Boston, MA, for Primetime 24 Joint Venture.

Leslie Jean Lott, Lott & Friedland, Coral Gables, FL, David Kenneth Friedland, Lott & Friedland, Coral Gables, FL, for National Football League.

Alan Graham Greer, Richman Greer Weil Brumbaugh Mirabito et al., Miami, FL, Manuel Antonio Garcia–Linares, Richman Greer Weil Brumbaugh Mirabito et al., Miami, FL, Jay T. Smith, Covington & Burling, Washington, DC, for DirecTV, Inc.

James Yates, Pearland, TX, for James Yates.

Lois Yates, Pearland, TX, for Lois Yates.

Michael C. Zusman, Evans & Zusman, P.C., Portland, OR, for Michael C. Zusman.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

This cause was tried before the Court non-jury on August 10, 1998 to August 19, 1998. Based upon the evidence presented through witness testimony, deposition testimony, documents, and exhibits, and pursuant to Federal Rule of Civil Procedure 52(a), the Court enters the following findings of fact and conclusions of law.

### I.  INTRODUCTION

This is a copyright infringement action in which the Plaintiffs[1] seek injunctive relief pursuant to Section 502 of the Copyright Act, 17 U.S.C. § 502, and costs and attorney's fees pursuant to Section 505 of the Copyright Act, 17 U.S.C. § 505. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Plaintiffs own exclusive rights in copyrighted network television programs that PrimeTime 24 Joint Venture ("PrimeTime") is retransmitting via satellite to its subscribers nationwide. Plaintiffs claim that PrimeTime's retransmissions violate Plaintiffs' copyright in its network televi-

---

1.  CBS Broadcasting Inc., Fox Broadcasting Co., Group W/CBS Television Stations Partners, CBS Television Affiliates Association, Post–Newsweek Stations Florida, Inc., KPAX Communications, Inc., LWWI Broadcasting, Inc., and RETLAW Enterprises, Inc. (collectively "Plaintiffs")

sion broadcasts. The principal issue is whether PrimeTime's actions are permitted by the Satellite Home Viewers Act ("SHVA") 17 U.S.C. § 119, which provides a limited statutory license to satellite carriers.[2] The license in the SHVA permits PrimeTime to transmit network programming only to "unserved households".

An "unserved household" is defined in 17 U.S.C. § 119(d)(10) as

a household that—

(a) cannot receive, through the use of a conventional outdoor rooftop receiving antenna, *an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission)* of a primary network station affiliated with that network, and

(B) has not, within 90 days before the date on which that household subscribes, either initially or on renewal, to receive secondary transmissions by a satellite carrier of a network station affiliated with that network, subscribed to a cable system that provides the signal of a primary network station affiliated with that network."

17 U.S.C. § 119(d)(10) (emphasis added).

The principal dispute between the parties is over the meaning of the phrase "over-the-air signal of grade B intensity (as defined by the [FCC])" in Section 119(d)(10)(A) and what remedy the Court should impose to ensure compliance with the statute.

## II. PROCEDURAL BACKGROUND

The Court previously issued several rulings that resolve many of the legal and factual issues presented by this lawsuit. The Court's prior written rulings include the May 13, 1998 Order Affirming In Part and Reversing in Part Magistrate Judge Johnson's Report and Recommendation (the "May 13, 1998 Order"); the July 10, 1998 Sealed Order (filed on August 13, 1998 in redacted form); the Order Denying Defendant's Motion for Summary Judgment (July 26, 1998); the Order dated August 12, 1998 resolving various motions in limine, and the Report & Recommendation ("R & R") issued by Magistrate Judge Johnson on July 2, 1997. In addition, the Court issued numerous oral rulings during pretrial hearings and during the trial. Rather than repeat all of its prior rulings, the Court incorporates by reference all pertinent findings and conclusions from the earlier rulings.

On June 26, 1998, Plaintiffs moved for summary judgment. Due to the proximity of the trial date and the complexity of the issues, the Court deferred the motion in order to permit the parties to develop a full and complete record with respect to certain issues as to which PrimeTime claimed there existed a factual dispute.

In issuing the findings and conclusions set forth below, the Court has relied on a voluminous factual record, the parties' Pretrial Stipulation, and the parties' detailed legal briefing. Among other things, the Court has available to it testimony from nine days of evidentiary hearings: four days of testimony before Magistrate Judge Johnson in June 1997,[3] *see* Fed. R.Civ.P. 65(a)(2) (use at trial of materials from preliminary injunction hearing), and five days of trial before the Court in August 1998.[4] The Court has also admitted in evidence hundreds of exhibits offered by the parties; in most cases, the parties have stipulated to admission of the exhibits. The parties have also filed extensive deposition testimony from this and other cases against PrimeTime, and trial testimony from one of the parallel cases. The findings and conclusions set forth below are

---

**2.** In addition, PrimeTime has a contractual license from FoxNet, Inc., a subsidiary of Plaintiff Fox Broadcasting Company. The contractual license reiterates the standard provided in 17 U.S.C. § 119.

**3.** All citations to the transcript from this hearing will be: Hr'g Tr. date, page and (witness).

**4.** All citations to the trial proceedings will be: Trial Tr. page (witness).

based on all of the above materials, and on the record as a whole.

In a parallel copyright infringement action filed by ABC, Inc. against PrimeTime in the U.S. District Court in the Middle District of North Carolina, a final judgment has been issued against PrimeTime. *See ABC, Inc. v. PrimeTime 24 Joint Venture*, 17 F.Supp.2d 467 (M.D.N.C. July 16, 1998); *ABC, Inc. v. PrimeTime 24 Joint Venture*, 17 F.Supp.2d 478 (M.D.N.C. 1998). As discussed in detail below, the rulings by the *ABC, Inc.*, court are fully consistent with this Court's May 13, 1998 Order and with the rulings below.

The Court notes that on November 17, 1998, the FCC initiated an expedited rulemaking proceeding on the way it defines, measures, and predicts the strength of television signals in light of the SHVA. The FCC has placed this proceeding on an accelerated track so that it may completed by February 28, 1999. Although the Court delayed imposition of the preliminary injunction in light of the FCC's proposed rulemaking, the Court has chosen not to delay the issuance of its Findings of Fact and Conclusions of Law. Due to the complexity of the issues involved, the Court has determined that any further delay in issuing its findings would not promote finality and certainty, which is the goal of judicial decision making. As in all issues before the judiciary, the Court must resolve the action before it in light of what has been presented by the parties. However, the Court reserves the right to issue a supplemental order after the FCC has resolved the rulemaking issues pending before it relative to this lawsuit.

### III. THE PARTIES

#### A. Plaintiffs

Plaintiffs CBS Broadcasting Inc. ("CBS"), and Fox Broadcasting Co. ("Fox") are two separate national television broadcast networks. The remaining Plaintiffs consist of several individual CBS network stations and a trade association of CBS affiliate stations. CBS and Fox own exclusive rights in copyrighted network television programs such as "60 Minutes" and "The Simpsons." Pretrial Stip.[5] ¶¶ 5(B)(8)–(9). CBS and Fox broadcast their network programs nationwide through local television stations that, in turn, transmit the network's programming to viewers in their local markets. *Id.* at ¶¶ 5(A)(1)–(2). Some of the local CBS and Fox stations are owned by the CBS or Fox networks or by sister companies, but most local CBS and Fox stations are owned by third parties. *Id.* at ¶ 5(A)(1). These local television stations—affiliates—are licensed to broadcast CBS or Fox programs to their local markets.

The partnership between national broadcast networks and their affiliates enables local network stations to offer the viewing public a mix of 1) national programming provided centrally by the networks (i.e. "60 Minutes"), 2) local programming, such as news, weather, and public affairs, produced in-house by many local stations, and 3) syndicated programming acquired by local stations from third parties. *Id.* at ¶ 5(B)(6). For example, the local CBS affiliate provides its viewers with CBS's nationwide network programming, local news and weather, as well as programs from third parties (syndicated programming). This programming is available to the public for free, as long as they can receive the local broadcast signal.

As well as relying upon each other to provide programming to households nationwide, networks and affiliates rely upon each other financially. Both network stations and local affiliates derive a majority of their revenue from the sale of advertising time. Hr'g Tr. 6/2/97 at 52–53 (Farr). The advertising dollars are split such that the network receives the advertising dollars for network commercials, and the local affiliate receives the advertising dollars for local commercials. *Id.* at 51–53. Network

---

**5.** The parties' Pretrial Stipulation is located at  D.E. # 283.

stations sell advertising during all three of the categories of programming they offer: network programs (such as NFL Football and "60 Minutes"), local programs (such as the "6 O'Clock News"), and syndicated programs (such as "Rosie O'Donnell"). *Id.* at 49–51. While local stations sell commercial time for their local programming, the sale of advertising during network programs accounts for as much as half of total station revenues. *Id.* at 52:3–53:3. The price of such advertising is dependent on the type and size of a program's audience. *Id.* at 67–68, 75–76, 90–91.

Networks and affiliates both promote the programming of the other so as to increase a program's audience. Both networks and individual stations design their programming schedules and the promotional spots that appear during their programs to encourage maximum "audience flow"—where viewers stay tuned to the same channel from one program to the next. *Id.* at 56–58. For example, CBS provides local stations with time for a "local news tease" at 10:59 p.m. to promote the station's upcoming 11 p.m. news program. *Id.* at 56. Given that advertising dollars increase when viewership increases, maximizing viewership for both network and local stations is of great importance to maintaining the network/affiliate relationship.

**B. PrimeTime**

PrimeTime is a satellite carrier engaged in the business of uplinking the signals of network television stations—including CBS and Fox television networks—via satellite and retransmitting those signals for a fee to subscribers of its services. Pretrial Stip. at ¶ 5(C)(10) PrimeTime does not retransmit the signals of each local affiliate to its subscribers in that area; rather, it offers the same network signals for sale to its subscribers. Hr'g Tr. 6/4/97 at 94–95 (Amira).[6]

Specifically, PrimeTime has a contractual arrangement with two CBS affiliates (WRAL from Raleigh, North Carolina and WPIX from San Francisco, California) and FoxNet, Inc. and broadcasts the programming from those affiliates to all PrimeTime subscribers. Hr'g Tr. 6/4/97 at 94–102 (Amira); Pretrial Stip. at ¶ 5(B)(9). PrimeTime takes the CBS and Fox signals and retransmits them to PrimeTime subscribers through home satellite dishes. Hr'g Tr. 6/4/97 at 94–95 (Amira). In PrimeTime's retransmissions of network programming, local commercials are replaced with national advertisements and the revenues from this advertising is split between PrimeTime and the affiliate (i.e., FoxNet, WPIX, and WRAL) *Id.* at 103–104.

PrimeTime sells its service through distributors, such as DirecTV and Echostar, or directly to owners of certain satellite dishes. Pretrial Stip. at ¶ 5(C)(11)–(14). As of June, 1998, PrimeTime had approximately three million subscribers, and most of PrimeTime's growth is through customer sales to owners of small dishes who purchase programming from packagers such as DirecTV or Echostar.

PrimeTime offers two network programming packages, PrimeTime East and PrimeTime West, as well as FoxNet, which offers Fox network programs. *Id.* at ¶ 5(C)(15). PrimeTime East is a package of ABC, CBS, and NBC programming from network stations located on the East Coast. PrimeTime West is a package of ABC, CBS, and NBC programming from network stations located on the West Coast. Subscribers can receive PrimeTime East, PrimeTime West and FoxNet individually or in combination with each other. *Id.*

PrimeTime does not have a license from CBS or Fox to retransmit its programming. *Id.* at ¶ 5(B)(8)–(9) PrimeTime has

---

**6.** PrimeTime's transmission of network broadcasts differs from cable which is required to carry local stations. *See Turner*

*Broadcasting Sys. v. FCC,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997).

contracted with a Fox subsidiary, FoxNet, and the two CBS affiliates, WRAL and WPIX, to transmit network broadcasts; however, the agreement limits these broadcasts to "unserved households" as defined by the SHVA. Hr'g Tr. 6/4/97 at 103 (Amira).

## IV. FINDINGS OF FACT

### A. PrimeTime's Efforts to Comply with the SHVA

PrimeTime has made some attempts to comply with the "unserved household" limitation contained in the SHVA. PrimeTime or its distributors, ask potential subscribers three questions: 1) whether they intend to use the programming for residential use; 2) whether they have subscribed to cable in the last 90 days; and 3) whether the household receives an acceptable picture through the use of a conventional rooftop antenna.[7] Pretrial Stip. ¶ 5(C)(18); Hr'g Tr. 6/5/97 at 19:5–24 (Levi). PrimeTime has always made its initial eligibility determinations exclusively on what the subscriber tells the customer service representative in response to these three questions. Pretrial Stip. ¶ 5(C)(18).

PrimeTime will typically supply services to persons who state that they: 1) intend to use the programming for residential use, 2) have not subscribed to cable in the last 90 days, and 3) do not receive an acceptable picture over the air. PrimeTime does not independently verify whether its subscribers receive a signal strength of grade B intensity from local network stations. *Id.* at ¶ 5(C)(22). PrimeTime also does not check the location of potential subscribers to determine if they are

likely to be able to receive a signal of grade B intensity. *Id.*

As further discussed *infra* at 31, Congress imposed an objective test to determine whether a subscriber was eligible for network programming from PrimeTime. PrimeTime was fully aware that the SHVA's grade B standard did not take into account a viewer's perception of picture quality. PrimeTime simply ignored the grade B test even though it "tried and failed to persuade Congress to adopt a test of eligibility based on subscriber statements about over-the-air reception." R & R at 32–33.[8] In a December 18, 1996 mailing to subscribers regarding the SHVA, PrimeTime stated that the Act imposes "a technical standard used by the [FCC] as an indicator of adequate service. Unfortunately, this technical standard often does not reflect the quality of the picture that you are actually getting on your television set." R & R at 12 (citing Def.Ex. 40). Similarly, in efforts to persuade subscribers to write their legislative representative, PrimeTime stated that "[u]nder the current law, your ability to view satellite network TV is based upon the intensity of the signal you receive from your local station, not based upon the quality of the picture on your TV set. . . ." *Id.* at 12–13 (Def.Ex.24).

PrimeTime's efforts to comply with the SKVA, its use of questionnaires, is insufficient to meet Congress' objective test. As the Court held in its May 13, 1998 Order, asking potential subscribers about picture quality, simply fails to provide evidence that such subscribers fit within Congress'

---

**7.** Before asking the third question, PrimeTime suggests that its distributors tell potential subscribers that, if they say that they receive an acceptable quality picture, they will not be eligible to receive network service. *See* Trial Tr. of Andrea Jacobs, VP–Customer Services, DirecTV, in *Cannan Communics., Inc. v. PrimeTime 24 Joint Venture,* No. 2–96–CV–086 (N.D.Tex.) (the "Amarillo Litigation") at 855:19–23 ("Q: So, they are first told that they are entitled to receive the network service if they don't receive good quality local

reception from their local network affiliate before they are asked the question about their reception? A: That is correct."); *ABC, Inc.,* 17 F.Supp.2d at 469. In other words, PrimeTime's customers are told the "right answer" before they are asked whether they receive good quality reception.

**8.** The Magistrate Judge's Report and Recommendation is located at D.E. # 148.

definition of an "unserved household".[9]
*See* May 13, 1998 Order at 21.

## B. PrimeTime Has Not Met It's Burden of Proof under the SHVA

As discussed *infra* at 33, the SHVA places the burden upon PrimeTime to prove that it is not transmitting network programming to ineligible households. PrimeTime's evidence consists of: 1) its questionnaire regarding whether a household receives an "acceptable picture;" 2) signal intensity tests conducted at or near the homes of 13 PrimeTime subscribers in or near Missoula, Montana; and 3) affiliate stations' consent that certain locations in their local markets do not receive grade B intensity signals from the stations. After carefully considering the evidence and the applicable law as discussed in the Conclusions of Law section, the Court finds that PrimeTime has failed to meet its burden.

### 1. PrimeTime's Questionnaires

PrimeTime's questionnaires fail to consider that the SHVA imposed an objective standard to determine whether a household is "unserved". The emphasis in the SRVA was whether a household can receive a grade B signal from a local station. Although there is evidence that there is a strong correlation between signal intensity and picture quality when multiple, neutral observers evaluate picture quality using properly functioning rooftop antennas, PrimeTime has presented no credible evidence that there is a strong correlation between signal intensity and answers about picture quality supplied by prospective PrimeTime customers. *See* Trial Tr. 204–205 (Cohen).

As noted in the Magistrate Judge's R & R and in the Court's May 13, 1998 Order, "there are a variety of reasons, unrelated

to being an 'unserved household' why a customer might sign up for PrimeTime 24." Court's May 13, 1998 Order at 20 (citing R & R at 10). For example, "viewers with access to additional network stations can watch network programs several hours later (or earlier) by watching a station from a distant time zone and can see sports programs (such as NFL football) that are not available locally." *Id.* Additionally, PrimeTime subscribers receive digital programming, and do not need to install or maintain a conventional rooftop antenna.

As PrimeTime's own expert witness Richard Biby testified, if a potential subscriber stated that he could not receive a good quality picture over the air, such an answer would provide him with "no scientifically or engineering valid data ... on which to have an opinion [about the signal intensity at that location]." Plaintiffs Ex. 566 at 119–20 (Biby).[10] In addition, PrimeTime's experts have admitted that subjective assessments of picture quality by biased observers are not reliable. Trial Tr. at 712–13 (Culver) (better to use an independent observer to assess picture quality if there is reason to suspect bias); *id.* at 886 (Biby) (stating that "[a] very significant uncertainty has been introduced in using the viewer or the homeowner as the observer as compared with an expert"); *see* R & R at 31 n. 17 (citing testimony of PrimeTime's experts William Hassinger and Russell Neuman).

Even if PrimeTime's subscribers were unbiased observers, PrimeTime has presented no evidence that its subscribers have properly functioning and correctly oriented rooftop antennas. *See also* Trial Tr. 709 (Culver) (at several of 13 locations tested by PrimeTime, Culver could have

---

**9.** The North Carolina court likewise held in *ABC*, that PrimeTime "may forego signal-strength testing only at their peril." *See ABC, Inc.*, 17 F.Supp.2d at 474.

**10.** During the August 1998 trial proceeding, in lieu of a live cross examination of Prime-

Time's expert Mr. Biby, Plaintiffs offered marked passages of his deposition. *See* Trial Tr. at 881. The Court accepted the marked pages of Mr. Biby's deposition, Plaintiffs Ex. 566, and agreed to consider it as Plaintiffs' cross examination.

configured homeowner's equipment to get better picture quality). In fact, PrimeTime's subscriber questionnaires reflect that many of their subscribers do not have rooftop antennas at all.[11] And for those customers who do have rooftop antennas, PrimeTime presented no evidence that the antennas and transmission lines are properly oriented and in good working order. PrimeTime's engineering expert Richard Biby conceded that he had no information on that subject. *See* Plaintiffs Ex. 566, Tr. 139–40.

For these reasons, the Court finds that PrimeTime cannot rely on statements by subscribers about picture quality as a substitute for actual signal intensity measurements showing that the subscribers do not receive signals of grade B intensity.

### 2. PrimeTime's Signal Intensity Tests

PrimeTime submitted the results of signal tests taken by PrimeTime's expert Mr. Culver at 13 subscribers' homes in Missoula, Montana. For many reasons, PrimeTime cannot rely on these 13 tests in Montana to meet its burden of proof. Most fundamentally, these households were not selected on a random basis; rather, they were selected by PrimeTime itself. Trial Tr. 628–29 (Culver). As such, these tests cannot be used to generalize as to PrimeTime's subscribers as a whole. *See* Hr'g Tr. 8/3/98 30–31 (concession by PrimeTime's counsel). In addition, the majority of these tests did not measure the household's signal intensity because Mr. Culver used the homeowners' own antenna and transmission line. Because Mr. Culver was using unknown equipment, it is impossible to measure signal intensity with precision. Trial Tr. at 687–93 (Culver).[12]

Furthermore, at two of the households that did not have an antenna, Mr. Culver measured the broadcast signal using a standardized, properly functioning outdoor antenna. *Id.* at 679–81. At both locations, the households received a broadcast signal from a local station that was far above grade B. Thus, PrimeTime's own signal intensity tests demonstrate that a number of its subscribers receive a signal of grade B intensity of better.

### 3. Local Network Affiliates' Consent to Satellite Broadcasts in Certain Areas

PrimeTime has presented, through deposition testimony and documents, evidence that some local stations have conceded that there may be certain locations in their markets that do not receive a grade B intensity signal. This evidence does not establish that PrimeTime's subscribers fall within the definition of "unserved households". First, such admissions do not mean that PrimeTime subscribers are only located in those areas. Second, as noted in the Court's May 13, 1998 Order and the Magistrate Judge's R & R, PrimeTime does not restrict its sale of network programming to locations that local stations have stated are unserved. In fact, PrimeTime places no geographical limits on its sale of CBS and Fox programming.

As none of PrimeTime's evidence establishes that its subscribers do not receive a signal of grade B intensity, PrimeTime has failed to meet its burden of proving that it

11. *See, e.g.,* Plaintiffs Ex. 317. Among the many such questionnaires are: PTM 013603 (household does not have rooftop antenna because it is "[d]eclasse to have a 50's style antenna on roof"); PTM 015739 (household does not have rooftop antenna because "it detracts from the beautity [sic] of our new house"); PTM 012152 (listing inconvenience as reason "I do not want a rooftop antenna"); PTM 016143 (listing expense, inconvenience and "ugliness" as reasons household did not have rooftop antenna).

12. During the questioning of Mr Culver, it became apparent that the purpose of these tests were to assess the reception of network services, and not to measure signal intensity. Trial Tr. at 689.

is providing network services only to "unserved households."

## C. Plaintiffs' Evidence that PrimeTime is Violating the SHVA

Although Plaintiffs do not bear the burden of establishing that PrimeTime has violated the SHVA, because Plaintiffs' evidence strongly supports the conclusion that PrimeTime is violating the SHVA, the Court will discuss Plaintiffs' evidence. Plaintiffs have presented two types of evidence to establish that an overwhelming majority of PrimeTime's subscribers receive a signal of grade B or better. This evidence is 1) signal strength tests taken at over 400 randomly selected locations in the Miami, Charlotte, Baltimore, and Pittsburgh areas; and 2) Longley–Rice propagation maps.

### 1. Plaintiffs' Signal Strength Tests

Plaintiffs presented evidence of signal strength tests taken at over 400 randomly-selected locations in the Miami, Charlotte, Baltimore, and Pittsburgh areas. Plaintiffs' broadcast engineering expert Jules Cohen testified that, with the exception of Miami, he personally selected the markets to be tested based on his engineering experience regarding the characteristics of broadcast markets.[13] Trial Tr. 181–83 (Cohen); *see also* Plaintiffs Ex. 558 (expert report of Jules Cohen) at ¶¶ 25–26. Through the use of a statistical expert,

Plaintiffs randomly selected approximately 100 PrimeTime subscribers in each of the four markets. Trial Tr. 183:11–24 (Cohen); *id.* at 485:22–486:24 (Sudman). Mr. Cohen then supervised testing of these homes using the measurement procedures specified by the FCC in 47 C.F.R. § 73.686. Trial Tr. 186 (Cohen).[14]

Plaintiffs' signal strength test results were significant in that, in every case, the majority of subscribers (and usually 90–100%) were measured to receive a signal of grade B intensity from a local network station of the relevant network.[15] *See* Trial Tr. 190 (Cohen); Plaintiffs Ex. 558 (expert report of Jules Cohen), at ¶¶ 32–35. Perhaps most significant are the results from Charlotte, North Carolina, a market that PrimeTime itself stated would be an "appropriate" choice for carrying out signal intensity tests. *See* PrimeTime's Obj. to the Magistrate Judge's R & R, D.E. # 156, at 38 (Aug. 1, 1997).[16] In Charlotte, 99 out of 101 randomly tested subscribers, or 98%, were measured to receive signals of at least grade B intensity from a CBS station. Plaintiffs Ex. 558 at ¶ 33. Of the tested subscribers, 64% received signals of at least grade A intensity from a CBS station. *Id.*

Plaintiffs further presented the testimony of a nationally recognized statistical expert, Professor Seymour Sudman, who testified that, because the testing was per-

---

**13.** Mr. Cohen selected Charlotte and Baltimore as typical markets with varying terrain and Pittsburgh as a worst case scenario due to its extremely difficult terrain. Trial Tr. at 181–83 (Cohen). To make Pittsburgh still more a worst case, Mr. Cohen chose a UHF station (Channel 53) in that market. Plaintiffs Ex. 558 (expert report of Jules Cohen), at ¶ 26.

**14.** The procedures used by Mr. Cohen are actually more conservative than those set forth in Section 73.686, in that Mr. Cohen does not use the median measurement, but instead uses the median less one standard deviation (a statistical measure of variability). Trial Tr. 192 (Cohen); Plaintiffs Ex. 558 (expert report of Jules Cohen), at ¶ 31.

**15.** The percentages of randomly selected subscribers who were measured to receive at least a grade B intensity signal from a local station of the relevant network were as follows: Miami (CBS), 100%; Miami (Fox), 100%; Charlotte (CBS), 98%; Pittsburgh (Fox), 59%; Baltimore (CBS), 91%. Plaintiffs Ex. 558 at ¶¶ 32–35 (expert report of Jules Cohen).

**16.** PrimeTime had criticized Plaintiffs at the preliminary injunction stage for conducting tests in Miami on the grounds that South Florida is atypically flat. In doing so, PrimeTime stated that Charlotte, North Carolina would be an appropriate place to do testing, presumably because, as Mr. Cohen points out, its terrain is typical of many U.S. markets.

formed on a random sample of PrimeTime subscribers, the results could be generalized to the entire population of the area from which the sample was drawn. Trial Tr. 491–94 (Sudman). Thus, for example, there is a 95 percent likelihood that a minimum of 95 percent of PrimeTime subscribers in the Charlotte area receive a signal of at least grade B strength from a CBS station. *Id.* at 494. Plaintiffs' signal intensity testing at randomly selected homes in a variety of markets provides overwhelming evidence that the great majority of PrimeTime subscribers are ineligible to receive its network service.

### 2. Plaintiffs' Longley–Rice Maps

In addition to the actual test results at over 400 randomly selected PrimeTime subscriber households, Plaintiffs have also submitted maps showing both (a) the predicted propagation of 43 CBS or Fox television stations and (b) the locations of PrimeTime subscribers in the vicinity of those stations. *See* Plaintiffs Ex. 335. The Court admitted these maps as demonstrative aids to facilitate an understanding of the testimony of Plaintiffs' expert, Mr. Cohen. Although Plaintiffs were not required to present such evidence—since the burden of proof is on Prime-Time—these maps provide further confirmation that PrimeTime is selling to large numbers of ineligible subscribers.

### i. Longley–Rice Propagation Maps

Traditionally, the FCC and broadcast engineers have relied on a relatively simple method of predicting the coverage of

TV stations, which results in so-called "FCC-predicted" "Grade B contours," or simply "FCC Grade B contours." *See* 47 C.F.R. § 73.684 (1998). However, FCC Grade B contours do not take into account the detailed terrain surrounding the television tower in question. Trial Tr. 51 (Cohen). Since terrain can effect TV coverage, U.S. government scientists developed a methodology, known as "Longley–Rice", that takes detailed terrain information into account. *Id.* at 52–53. This methodology now exists in the form of a computer program that can be obtained from an agency of the U.S. Department of Commerce. *Id.* at 54:6–18. The terrain data that the Longley–Rice program analyzes likewise comes from U.S. Government sources. *Id.* at 57–58.

To generate a Longley–Rice map for a station, an engineer must input certain parameters into the program. In its Office of Engineering and Technology Bulletin 69, the FCC specified certain parameters to be employed in creating a Longley–Rice map to evaluate TV coverage. Plaintiffs Ex. 333, FCC OET Bulletin 69. Both parties' experts have testified that the parameters specified in Bulletin 69 are the standard ones employed when using Longley–Rice for analog stations in the broadcast industry.[17] Among other things, these are the parameters used by the FCC to predict station propagation for purposes of "replicating" the current coverage areas of analog broadcast stations in making new digital allotments to TV stations. Trial Tr. 91–92 (Cohen).[18]

---

17. *See* Trial Tr. 71 (Cohen); Plaintiffs Ex. 566, Tr. 82 (Biby) ("For the purposes of attempting to replicate the predicted area coverage, the FCC, as I recall, used a 50 percent time, 50 percent area"); Trial Tr. 706–07 (Culver).

18. The Longley–Rice maps provided by Plaintiffs differ in some respects from those created by the FCC for purposes of replicating the current coverage areas of analog stations. First, if the terrain is unusually favorable, such as west of Fresno, California, Longley–Rice sometimes predicts coverage that ex-

tends beyond the traditional Grade B contour of a particular station. *See* Plaintiffs Ex. 335. The FCC limited Longley–Rice predicted propagation areas to stations' traditional Grade B contours. *See* Plaintiffs Ex. 333, FCC OET Bulletin 69. Second, the OET bulletin states that "[f]or cells with population, the point chosen by the FCC computer program is the population centroid, otherwise it is the geometric center; . . . ." *Id.* at 7. PrimeTime has emphasized that Plaintiffs used the geometric center, rather than the population center and as a result, Plaintiffs maps should not be given any weight. Dr. Cohen stated

Mr. Cohen arranged for and supervised the creation of Plaintiffs' Longley–Rice maps and has personal knowledge of how such maps were created. *Id.* at 71–72; Hr'g Tr. 6/3/97 at 260, 264 (Cohen). Mr. Cohen also testified that such maps were reasonably relied upon by experts in his field and that he personally generated Longley–Rice propagation maps for 22 of the stations to verify their accuracy. Trial Tr. at 158 (Cohen).

The great majority of the stations selected for mapping by Mr. Cohen were chosen through a process of stratified sampling, which is a widely used method of selecting a random sample. *Id.* at 495–97 (Sudman). All of the top 15 television markets (New York, Chicago, Los Angeles, etc.) were included in the sample, because those markets alone account for a high percentage of all U.S. television households. *Id.* at 497. An additional 20 stations were selected through random sampling of stations in markets below the top 15. *Id.* at 498–99. The remaining eight maps show the five Plaintiff stations and three additional stations in south Florida.

### ii. Geocoding of Subscriber Locations

The locations of PrimeTime subscriber were plotted on the maps through a process known as geocoding. Geocoding is a commercially available process that uses subscriber addresses, in combination with database information from the U.S. Census Bureau and the U.S. Post Office, to provide detailed longitude and latitude information for specific subscribers. *Id.* at 73 (Cohen). The locations of PrimeTime's subscribers are represented by black dots on the maps submitted by Plaintiffs. *Id.* Mr. Cohen himself personally used the geocoding software and verified its accuracy. *Id.* at 79–80. In addition to the black dots showing the locations of PrimeTime subscribers, Plaintiffs' maps also contain counts of the numbers of subscribers in the Longley–Rice Grade A and Grade B areas and in other defined areas. *Id.* at 138–139; *see also* Plaintiffs Ex. 335, 347.

The subscriber address information reflected in the maps was obtained from PrimeTime pursuant to its statutory obligation to report newly installed customers each month. Trial Tr. 135–36, 140 (Cohen); *id.* at 752–61 (Rohrer). CBS and Fox forwarded PrimeTime's list of subscribers to Joe Lewis of Decision Support Services, an expert mapping company working under Mr. Cohen's supervision. *Id.* at 137–38 (Cohen); *id.* at 762–63 (Rohrer). Mr. Lewis created a master compact disk combining the data forwarded to him by CBS and Fox, *id.* at 137 (Cohen); *id.* at 432:9–15 (Prender), and used this master list to geocode the locations of the individual subscribers. *Id.* at 137–38 (Cohen).

PrimeTime objected to Plaintiffs' geocoding of its subscribers on its maps. PrimeTime maintains that Plaintiffs have failed to present competent testimony regarding what information Mr. Lewis used in locating PrimeTime subscribers on Plaintiffs' maps, and the process Mr. Lewis used. During the trial, the Court heard testimony from Plaintiffs of the procedures used to compile the list of PrimeTime subscribers and the methodology used to locate them on the Longley–Rice maps. PrimeTime's objections focus on the methods Plaintiffs utilized, but fail to demonstrate that Plaintiffs maps are unreliable. As such, PrimeTime's objections go to the weight of the evidence and not to its admissibility. Although PrimeTime had ample time to point out any errors in the data

that in Plaintiffs' maps, they utilized the geographic centroid because they were looking to measure signal intensity in general areas without regard to population. Trial Tr. 318 (Cohen). Furthermore, Dr. Cohen testified that there would be little difference in the maps even if Plaintiffs had utilized the population centroid. The Court finds that PrimeTime is exaggerating the effect of using the "geographic centroid" and that the maps are useful evidence.

used by Plaintiffs, PrimeTime offered no such evidence.

### iii. Mr. Cohen's Testimony

Mr. Cohen testified that in his expert opinion, the signal intensity tests and Plaintiffs' maps (Plaintiffs Ex. 335 & 347) demonstrate that PrimeTime is selling network programming to large numbers of subscribers in urban and suburban areas that receive grade B intensity—and in most cases grade A intensity—signals. The Court accepts Mr. Cohen's expert opinion that the great majority of Prime-Time subscribers within the predicted grade B contours of CBS and Fox stations are capable of receiving at least a grade B intensity signal from a local CBS or Fox station using a conventional outdoor roof-top antenna. Trial Tr. 152–53 (Cohen). Indeed, in most markets, the majority of subscribers can receive signals stronger than the grade A level. *Id.*

### D. The Result of PrimeTime's Conduct

PrimeTime's actions have affected the network/affiliate relationship because individuals who subscribe to its service do not watch local network programs provided by the affiliates. This is due to the fact that PrimeTime does not transmit local affiliate programming or advertising. Instead, as mentioned previously, PrimeTime transmits the network programs broadcast by the handful of affiliates with which it has a contractual agreement, and substitutes local advertising with national advertising. Accordingly, PrimeTime's violation of the SHVA is reducing the number of viewers for local affiliate programming and advertising, which in turn reduces an affiliate's revenue stream. Tr. Hr'g 6/2/97 at 68–69, 75–76, 80–82 (Farr); *id.* at 152 (Schmidt).

PrimeTime maintains that its subscribers would not be watching affiliate programming because they cannot adequately receive the affiliate's programming. However, PrimeTime assumes that its subscribers cannot receive an adequate picture from its affiliate. PrimeTime's own

evidence at trial belies this position. During trial, PrimeTime presented evidence of picture quality received at 13 homes in Missoula, Montana. PrimeTime's own expert found that not only did several of the homes receive a signal of grade B intensity, but the picture quality at several of these homes was adequate for viewing purposes. *See* Trial Tr. 667–675; PrimeTime Ex. 641A. Thus, the Court disagrees with PrimeTime that affiliates are not affected by PrimeTime's retransmissions of network programming to subscribers who can receive a signal of grade B intensity or better.

## V. CONCLUSIONS OF LAW

### A. The Satellite Home Viewers Act ("SHVA")

In 1988, Congress crafted the satellite carrier "compulsory license," which contains a narrow exception to a network's exclusive copyright over its programming. This exception, codified in 17 U.S.C. § 119, allows satellite carriers to deliver network programming to certain satellite dish owners without the copyright owner's permission. By enacting this provision, Congress sought to achieve two goals: (1) to make network programming available to the small number of households that otherwise lack access to it, while (2) preserving the existing national network/affiliate television distribution system by preventing satellite delivery of network programming to other households. *See Satellite Home Viewer[ ] Act of 1988*, H.R.Rep. No. 100–887, pt. 2 at 20 (1988) ("The Committee intends [by Section 119] to ... bring[ ] network programming to unserved areas *while preserving the exclusivity that is an integral part of today's network-affiliate relationship* ") (emphasis added); *ABC, Inc.*, 17 F.Supp.2d at 471.

To address these twin goals, Congress limited the satellite compulsory license to "unserved households" for private home viewing. 17 U.S.C. § 119(a)(2)(B). As discussed above, the definition of "un-

served household" has two parts. First, an "unserved household" is one that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of grade B intensity (as defined by the [FCC])" from a local network station of the same network. 17 U.S.C. § 119(d)(10)(A). Second, to be "unserved," a household must not have recently received network stations via cable. 17 U.S.C. § 119(d)(10)(B). Unless a customer meets these criteria, PrimeTime has no statutory license to transmit CBS or Fox programming to that customer.

▆▆ As this Court explained in its May 13, 1998 Order, the first requirement—inability to receive a signal of grade B intensity—is a strictly objective standard. *See* May 13, 1998 Order at 12–17; R & R at 27. The intensity of television signals is measured in units called "dBu's." [19] This Court and the *ABC, Inc.* court are in agreement that, in drafting the definition of "unserved households," Congress adopted the "grade B" values promulgated by the FCC. *See* H.R.Rep. 100–887, pt. 1, at 26.[20] Congress' 1994 amendments to the SHVA "did not alter the definition of an unserved household." *ABC, Inc.*, 17 F.Supp.2d at 473. For that reason, under the Act, "an unserved household ... is one that cannot receive a signal of [47, 56, or 64] dBu [depending upon the channel at issue] with a conventional outdoor rooftop antenna and has not recently received network programming via cable television." *Id.* at 13.

Congress rejected a bill proposed by PrimeTime and other satellite carriers that would have permitted viewers to receive network services by satellite if they submitted affidavits indicating that they did not receive adequate service over the air. May 13, 1998 Order at 14; *See* R & R at n.

16. Although Congress rejected this bill, PrimeTime continues to argue to this Court that Congress meant to adopt such a standard. However, as noted in the Magistrate Judge's Report, "[w]hen Congress has expressly considered and rejected a proposal to include particular provisions in a statute, 'there could hardly be [a] clearer indication' that a law does not have the meaning it would have had if the proposal had been accepted." R & R at 29–30 (citing *Tanner v. United States,* 483 U.S. 107, 125, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987)).

## B. PrimeTime Bears the Burden of Proving its Subscribers are "Unserved"

▆▆ Under the SHVA, a satellite carrier such as PrimeTime, has the burden at trial of proving that its transmission of network programming goes only to "unserved households." 17 U.S.C. § 119(a)(5)(D). As discussed *supra* at 14, PrimeTime has failed to meet this burden.

## C. Wilful or Repeated Standard

▆▆ Under the SHVA, a copyright violation exists where a satellite carrier makes "willful" *or* "repeated" transmissions of a network station's TV programming to a subscriber who does not reside in an unserved household. 17 U.S.C. § 119(a)(5)(A) (emphasis added). The Court has already set forth its interpretation of this statutory phrase in its May 13, 1998 Order (at 27–30) and in the pertinent portions of the R & R (at 31–33) that the Court adopted by reference. As PrimeTime itself has successfully asserted in other litigation, "[t]o prove willfulness, it is necessary only to show that a person knew it was doing the acts in question, not that the person knew those acts were wrong."

---

**19.** The minimum dBu levels specified by the FCC as "Grade B"—47 dBu's for television channels 2–6, 56 dBu's for channels 7–13, and 64 dBu's for channels 13–69—are incorporated by reference in Section 119.

**20.** *See ABC, Inc.,* 17 F.Supp.2d at 472 ("Congress can clearly adopt ... any portion of the Code of Federal Regulations which it considers relevant to defining a new statutory term. It is apparent that Congress has done so here.").

R & R at 31. By that standard, there is no question that PrimeTime's violations of the "unserved household" limitation were willful.

■ Even if the "willful or repeated" standard required a finding of gross negligence, as PrimeTime contends, PrimeTime's violations were willful in that sense as well. After reviewing arguments from PrimeTime virtually identical to those it has advanced in this lawsuit, the *ABC, Inc.* court "ha[d] no difficulty concluding that no reasonable fact finder could fail to find that PrimeTime was grossly negligent in complying with its duties under SHVA." *ABC, Inc.* F.Supp.2d at 475. The *ABC, Inc.* court concluded that "PrimeTime can muster only a protestation of good faith .... [however] [a] 'good faith belief as to what the law should be, or what you want the law to be, is not enough.'" *Id.* (*quoting Columbia Pictures Indus., Inc. v. Liberty Cable, Inc.*, 919 F.Supp. 685, 690 (S.D.N.Y.1996)). The same conclusions apply here.

The grounds for finding that PrimeTime's violations are "willful or repeated" even in the sense advocated by PrimeTime include the following:

(1) PrimeTime has relied exclusively on subscriber statements about their picture quality—and ignored the grade B standard—even though as discussed *supra* at 13, it was aware that the SHVA imposed an objective standard.

(2) PrimeTime does not conduct signal intensity measurements to determine whether its subscribers are "unserved", or utilize any other compliance methods. *See, e.g.,* Pretrial Stip. ¶ 5(C)(22).

(3) PrimeTime has failed to present evidence that any of its subscribers are "unserved" as defined under the SHVA.

(4) Plaintiffs' evidence indicates that an overwhelming majority of PrimeTime sub-scribers receive a signal of grade B intensity.

(5) PrimeTime and its distributors have made large profits by ignoring the legal standard that governs their businesses, and have spent minimal amounts on compliance. Casey Dep. Tr. 74, 79–82; Hirokawa Dep. Tr. 42–44.

### D. "Pattern or Practice" Liability

■ Under Section 119(a)(5)(B), if a satellite carrier engages in a willful or repeated "pattern or practice" of violating the "unserved household" limitation, the Court "shall" enter a permanent injunction "barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmission of any primary network station affiliated with the same network." *ABC, Inc.*, F.Supp.2d at 476.[21] Although the SHVA does not contain a definition of the term "pattern or practice," legislative history indicates that "no pattern or practice exists unless over twenty percent (20%) of a defendant satellite carrier's subscribers in a local market are ineligible to receive network programming." *Id.* (citing H.R.Rep. No. 100–887(I), at 19).

The Court finds that PrimeTime's actions constitute a pattern or practice of violating the SHVA. PrimeTime has failed to establish that any of its three million subscribers meet SHVA's criteria for eligibility. Furthermore, the evidence shows that PrimeTime made a conscious decision to flout the law when it was well aware of what the law required. *See supra* at 13. PrimeTime's attempt to comply with the SHVA was largely ineffectual and has led to "systematic violation of SHVA's white area restriction." *Id.* at 477. Accordingly, the Court finds that PrimeTime has engaged in a nationwide willful or repeated pattern or practice of infringements.

---

**21.** The FoxNet agreement incorporates Copyright Act procedures (such as the statutory remedy for pattern and practice violations) by reference in the event the parties are unable to reach agreement on the "unserved household" issue. PrimeTime Ex. 14 (FoxNet Agreement), at ¶ 4(c).

### E. Failure to Comply with Reporting Requirements

■ Section 119(a)(2)(C) imposes reporting requirements on satellite carriers that retransmit network programming. The Act requires PrimeTime 24 to provide networks (here CBS and Fox), by the 15th day of each month, with a list of all subscribers who signed up to receive programming of that network during the preceding month. 17 U.S.C. § 119(a)(2)(C). These lists must contain the name and street address, including county and Zip Code—and not, for example, merely a Post Office box—for each subscriber. 17 U.S.C. § 119(a)(2)(C).

Section 119(a)(3) provides that "[t]he willful or repeated secondary transmission to the public by a satellite carrier of a [network station's] primary transmission . . . is actionable as an act of infringement . . . where the satellite carrier . . . has failed to make the submissions to networks required by [Section 119(a) ](2)(C)." A plain reading of this section establishes that where a satellite carrier fails to make the required submissions, willful or repeated retransmissions of a network's programming violates the network's copyright. *See ABC, Inc.,* 17 F.Supp.2d at 477. Thus, under the SHVA, a satellite carrier is strictly liable for failing to comply with the reporting requirements. *Id.*

Plaintiffs have presented evidence that from July 1996 though November 1997 alone, PrimeTime signed up more than 40,000 subscribers for whom it reported either a Post Office box or some other invalid street address. Trial Tr. 437–38 (Prender); Plaintiffs Ex. 329. Furthermore, since January 1996, PrimeTime has never delivered its subscriber lists within 15 days of the end of the month in which the subscribers enrolled in its service. Pretrial Stip. § 5(C)(23); *see also* Levi Dep. Tr. (Raleigh) 304 (PrimeTime's *goal* is 45 days after the end of the month). On average, in 1996, PrimeTime provided subscriber lists 48 days after the end of the month in which the relevant subscribers enrolled in its service. Pretrial Stip. ¶ 5(C)(23). Although PrimeTime argues that the SHVA establishes unreasonable reporting requirements, the Court cannot rewrite legislation. Accordingly, the Court finds that PrimeTime has violated the reporting requirements of Section 119(a)(2) by failing to send its reports on the schedule mandated by the Act.

### F. PrimeTime's Defenses

#### 1. Alleged Lack of Harm

■ PrimeTime contends that, even if it has committed willful and repeated violations of the Copyright Act, the Court should not issue injunctive relief because Plaintiffs are not being harmed by the infringements. The Court has already held that there is a presumption of irreparable harm from copyright infringement. *See* May 13, 1998 Order at 30–32; R & R at 36–39. In any event, the presence or absence of harm to the plaintiffs is irrelevant to this copyright case, in which Plaintiffs are not seeking damages. *See, e.g., Ocasek v. Hegglund,* 116 F.R.D. 154, 160–61 (D.Wyo.1987) ("Under § 502(a), an injunction will issue when there is a substantial likelihood of further infringement of plaintiffs' copyrights. . . . [P]roof of irreparable injury is therefore irrelevant.") (internal quotations omitted). Instead, to be entitled to a permanent injunction under the Copyright Act, a copyright owner need show only past infringement and the threat of future infringement by the defendant. *See, e.g., Pacific & Southern Co. v. Duncan,* 744 F.2d 1490, 1499 (11th Cir. 1984) (district court abused discretion in refusing to grant permanent injunction based on district court finding that affected market is "relatively unimportant" to plaintiff); *Walt Disney Co. v. Powell,* 897 F.2d 565, 567–68 (D.C.Cir.1990) ("When a copyright plaintiff has established a threat of continuing infringement, he is entitled to an injunction. 'Generally, it would appear to be an abuse of discretion to deny a permanent injunction where liability has been established and there is a threat of

continuing infringement.' ") (citations omitted); *Morley Music Co. v. Cafe Continental, Inc.*, 777 F.Supp. 1579, 1582 (S.D.Fla. 1991) ("A plaintiff is entitled to a permanent injunction in a copyright action when liability has been established and where there is a threat of continuing violations."). Plaintiffs have established the necessary prerequisites for permanent injunctive relief, and need not prove specific harm.

Even if the existence of harm were relevant to Plaintiffs' case, this Court has already found, and reaffirms here, that the losses of goodwill suffered by stations when viewers blame them for having their unlawful service terminated constitutes irreparable injury. *See* R & R at 43–45; May 13, 1998 Order at 32–33; *see also* DirecTV June 1, 1998 filing, at 17 (same). Although there is ample evidence that networks and stations are hurt through loss of viewership, there is no need for the Court to reach that issue in light of the points discussed above.

#### 2. Unclean Hands

■ PrimeTime contends that Plaintiffs are not entitled to relief because they have "unclean hands." Generally, in order to obtain equitable relief, a party must "come to the Court with 'clean hands.' " *Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 846 (Fed.Cir.1992). To prevail on this equitable affirmative defense, PrimeTime would have to prove that Plaintiffs acted fraudulently, deceitfully, unconscionably, or in bad faith. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995). The Court has previously considered and rejected that argument, and does so again here. PrimeTime's evidence on this issue does not establish that CBS and Fox acted fraudulently, deceitfully, or in bad faith. The fact that the parties are involved in a serious dispute over the requirements established by the SHVA, is insufficient to support the defense of unclean hands. *See ABC, Inc.*, 17 F.Supp.2d at 484. Furthermore, as to PrimeTime's allegations regarding subscriber challenges, the Court incorporates by reference its discussion of PrimeTime's unclean hands argument at pp. 33–36 of the R & R. The additional materials to which PrimeTime has called the Court's attention do not alter its prior conclusions.

#### 3. Defenses Relating to Fox

PrimeTime contends that Fox is barred from seeking relief because (a) it allegedly failed to negotiate with PrimeTime about the "unserved household" dispute in violation of a contractual obligation to negotiate and (b) Fox's subsidiary, FoxNet, accepted monthly royalty payments from PrimeTime. The Court rejects these arguments.

PrimeTime contends that Fox violated a contractual duty to negotiate about the unserved household dispute. However, during the fall of 1996, before the filing of this lawsuit, Fox did engage in negotiations with PrimeTime about that dispute, through a broadcast industry group acting on behalf of Fox and the other three TV broadcast networks and their affiliates.[22]

#### b. Waiver and Ratification

■ PrimeTime argues that Fox waived its copyright infringement claims (or ratified the infringements) by accepting

---

**22.** *See* Amira Decl. ¶ 6 (Apr. 25, 1997) ("in the Autumn of 1996 a series of meetings attended by various representatives of the satellite industry and the network broadcast industry" took place); *id.* at ¶ 11 ("Then in the early Fall of 1996, the NAB [of which Fox and CBS are members] ... either proposed or agreed with the Satellite Broadcasting & Communications Association (of which PrimeTime 24 is a member) to engage in a series of meetings designed to resolve outstanding issues between the broadcasting industry and satellite carriers. The Autumn, 1996 industry talks that I referred to earlier were the result."); *id.* at ¶ 12 ("talks between the broadcast industry and PrimeTime took place from mid-October to mid-December, 1996"); *see also* Sullivan Dep.Tr. 158–59 (describing meetings with PrimeTime representatives on behalf of all affected networks and stations, including Fox).

monthly payments that PrimeTime made under the FoxNet agreement. Waiver is the intentional and voluntary relinquishment of a known right or privilege. *See U.S. v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir.1988). The affirmative defenses of waiver and ratification are "not favored," and a defendant bears a heavy burden to sustain them. *See Irvine v. Cargill Investor Serv., Inc.*, 799 F.2d 1461, 1463 (11th Cir.1986) (claim of waiver based on conduct requires that the conduct relied on must "make out a clear case" that the party intended to give up its rights). To support a waiver defense, PrimeTime must show that Fox acted in a manner that could reasonably be construed as an intent to abandon its rights under the Copyright Act. *Id.* at 1464 (conduct of party against whom ratification is alleged must amount to *"an affirmative election* showing their intention to adopt the unauthorized arrangement") (emphasis added).

■ Under the FoxNet and Prime-Time agreement, PrimeTime was precluded from broadcasting Fox programming to "served" households. The limitation of the contract to "unserved households" evidences an intent to enforce the SHVA's requirements. Furthermore, although FoxNet agreed to negotiate with Prime-Time regarding methods to determine whether a subscriber was "unserved," Fox participated in negotiations with Prime-Time through a broadcast industry group acting on behalf of Fox and the other three TV broadcast networks and their affiliates.

PrimeTime highlights the fact that Fox-Net received monthly payments from PrimeTime pursuant to the agreement between FoxNet and PrimeTime. However, the mere receipt of monthly benefits is far from the type of clear, decisive, and unequivocal conduct that is necessary to find an intent to waiver a legal right. Rather, Fox and the broadcast industry, have unquestionably sought to limit PrimeTime's rebroadcasts of network programming to "unserved" households. Such efforts have culminated in the instant litigation.[23]

## VI. Injunctive Relief

■ The Court's issuance of injunctive relief is guided by two pertinent sections of the Copyright Act.[24] *First,* under Section 119(a)(5)(A), the Court may order any of "the remedies provided by sections 502 through 506" under the "individual violations" provisions of Section 119. Section 502(a), in turn, authorizes the Court to "grant ... final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." As the language of Section 502(a) reflects, the Act grants broad discretion to the court in fashioning a remedy that the Court deems appropriate under the circumstances of a particular case. *See SAS Inst., Inc. v. S & H Computer Sys., Inc.*, 605 F.Supp. 816, 831 (M.D.Tenn.1985) ("The Court cannot accept [defendant's] arguments that its discretion under this broadly-stated provision [Section 502(a) of the Copyright Act] is narrowly constrained.").

■ Second, under Section 119(a)(5)(B)(i), if a satellite carrier engages

---

**23.** Courts have rejected waiver and ratification arguments in copyright cases when the allegedly "waiving" party did much less to demonstrate its continued interest in vindicating its rights. *See, e.g., United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir.1988) (rejecting defendant's argument that plaintiff waived copyright claim by accepting payment under copyright licensing agreement where plaintiff had communicated its interpretation of licensing argument to defendant); *see also Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F.Supp. 125, 135 (S.D.N.Y.1981) (rejecting waiver claim based

on acceptance of royalty check during pendency of arbitration), *aff'd,* 684 F.2d 228 (2d Cir.1982).

**24.** As discussed above, although PrimeTime's delivery of FoxNet is pursuant to a private license rather than the Section 119 compulsory license, the contract between FoxNet and PrimeTime provides that, absent an agreement to the contrary, the procedures applicable under the Copyright Act shall govern. PrimeTime Ex. 14, ¶ 4(c).

in a "willful or repeated pattern or practice" of delivering network programming "to subscribers who do not reside in unserved households" on a "substantially nationwide basis," the court "*shall* order a permanent injunction barring the secondary transmission by the satellite carrier, for private home viewing, of the primary transmissions of any primary network station affiliated with the same network." (emphasis added). That is, if a satellite carrier has engaged in the type of violations described in Section 119(a)(5)(B)(i), the carrier forfeits its right to continue taking advantage of the compulsory license. As the *ABC, Inc.* court held, Congress' use of the word "shall" means that issuance of the specified relief is mandatory. *See ABC, Inc.*, 17 F.Supp.2d at 487. The ABC, Inc. Court's analysis is consistent with the plain language of Section 119(a)(5)(B)(i),[25] and this Court reaches the same conclusion.

Despite the mandatory language of Section 119(a)(5)(B)(i), the Plaintiffs have advised the Court that they are willing to waive entry of the broad relief mandated by that provision, but only so long as the Court enters a narrower injunction on terms designed to halt PrimeTime's in-

fringements and prevent future infringements. In particular, Plaintiffs have advised the Court that they will waive their rights to Section 119(a)(5)(B)(i) relief if the Court enters an order patterned on the preliminary injunction entered by the Court on July 10, 1998.[26]

The Court recognizes that the SHVA mandates imposition of a broad injunction to remedy PrimeTime's violations. As Plaintiffs have waived that right in favor of an order patterned after the Court's preliminary injunction, and the parties have agreed to delay imposition of the preliminary injunction until February 28, 1999, the Court will reserve the right to file a supplementary order regarding the permanent injunction after February 28, 1999.

The relief previously ordered by the Court is appropriate for a second reason. As discussed above, independent of the relief available when a satellite carrier engages in a willful or repeated pattern or practice of violations, the Copyright Act also authorizes the Court to issue injunctive relief under Section 119(a)(5)(A) for "individual violations" of the Act. The orders the Court has previously entered in granting the preliminary injunction, is an

25. Section 119(a)(5)(B)(i) says that the court "shall" order the specified injunctive relief but "may" award statutory damages. Congress' choice of these different terms in the same statutory section shows a clear intent to mandate the specific form of injunctive relief specified by Congress.

26. In summary, the relief that Plaintiffs are willing to accept in lieu of the extremely broad relief mandated by Section 119(a)(5)(B)(i) includes the following elements:
- use of the testing procedure previously specified by the Court as the ultimate determinant of whether a particular household can or cannot receive a signal of grade B intensity from any CBS or Fox network station;
- in the absence of signal intensity test results or consent by the relevant station(s), use of *Longley–Rice propagation maps, created in* the manner specified by the Court in its July 10, 1998 Order, to determine whether a particular household may be provided with CBS or Fox programming by satellite;

- use of geocoding of accurate subscriber street addresses as the method for determining the latitude and longitude of particular subscribers;

- reliance on confirmation of cable status as the method of determining compliance with the prohibition on service to recent cable subscribers;

- requiring PrimeTime to terminate all business subscribers and to refrain from signing up any more such subscribers;

- requiring PrimeTime to comply strictly with the reporting requirements of Section 119(a)(2);

- directing PrimeTime to take steps similar to those specified in the stipulated Order Implementing Preliminary Injunction, D.E. # 356, to reduce losses of goodwill by stations during the termination process; and

- permitting stations to provide information to subscribers about how to receive local broadcast stations.

appropriate and equitable form of relief under the circumstances of this case.

*First,* as the only method by which PrimeTime can satisfy its burden of proof is through signal intensity testing, it is appropriate that the ultimate test for eligibility of any particular household is through an actual signal intensity test. The Court required that signal intensity tests be performed consistent with the methodology utilized by the FCC. As the FCC "defined" a signal of grade B intensity, the Court's adoption of the FCC's methodology was intended to provide the parties with an objective means of determining the parameters to use in performing a signal intensity test.

*Second,* the scientific evidence at trial showed that the terrain-adjusted Langley–Rice model, run using standard parameters, is accurate in predicting which of PrimeTime's subscribers can in fact receive signals of Grade B intensity from their local stations.[27] For example, in Charlotte, North Carolina, the Longley–Rice model, run in the standard way for analog stations, was successful 99% of the time in predicting whether PrimeTime subscribers would be able to receive signals of grade B intensity.[28] As the FCC had previously employed the Longley–Rice methodology, the Court considered that its use as a presumption would facilitate compliance with the SHVA without the burdensome requirement of signal intensity tests at each potential subscriber's home. The Court rejected PrimeTime's proposal to utilize different parameters to create the Longley–Rice maps because PrimeTime failed to present any evidence that

said maps more accurately predicted signal intensity at subscriber's homes.

*Third,* the Court has previously indicated, in considering the proper form of a preliminary injunction, that requiring satellite companies to obtain information about cable status directly from cable systems might be unduly cumbersome. The Court is therefore continuing the form of relief contained in the preliminary injunction on this point.

*Fourth,* there is extensive record evidence that, when ineligible subscribers are terminated, viewers who have grown accustomed to the service are often hostile toward their local stations. In addition, one of the central purposes of the Act is to protect local network stations from loss of viewership resulting from satellite carrier infringements. For both of those reasons, it is appropriate to order PrimeTime to take steps designed to ensure that ineligible subscribers are provided with adequate advance notice of termination and with relevant information about their options for receiving local stations. It is likewise appropriate to permit stations to contact ineligible subscribers to provide such information—which might include, for example, the names and addresses of local vendors capable of installing rooftop antennas.

Finally, Plaintiffs' proposed Findings of Fact and Conclusions of law contains research on the issue of attorney's fees. Rule 7.3 of the Local Rules of the United States District Court for the Southern District of Florida anticipates that a request for attorney's fees shall be through a motion. Furthermore, Rule 7.3 requires the

**27.** Longley–Rice maps provide the most widely used way, short of conducting actual field measurements, to determine the likely reach of a signal from a particular television station. *See, e.g., id.* at 52, 54.

**28.** The standard method of running Longley–Rice for analog stations, and the method employed for purposes of the permanent injunction, requires use of a 50% location factor and a 50% time factor to define the extreme outer edge of the predicted coverage area. Use of a 50% location factor for the extreme edge of

the Longley–Rice coverage area is consistent with the standard of proof in a civil case, which is "more likely than not." With regard to the time factor, the FCC built an extra margin of error into the dBu levels that it specified as Grade B. Trial Tr. 269:18–270:5 (Cohen). For that reason, "in real world terms," at the edge of the coverage area "50 percent of the people are going to get an acceptable picture 90 percent of the time." *Id.* at 270.

parties to confer and that the moving party file a certification regarding the time records, the motion, and the conference with opposing counsel. In light of Rule 7.3, the Court reserves ruling on attorney's fees until a motion has been filed in conformance with the Court's local rules.

### CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. In accordance with Federal Rule of Civil Procedure 58, the Court will enter a separate final judgment and permanent injunction.

2. This case is **CLOSED** for administrative purposes and all pending motions not otherwise ruled upon are **DENIED as moot.**