**ABC, INCORPORATED,**
**Plaintiff–Appellee,**

v.

**PRIMETIME 24, joint venture,**
**Defendant–Appellant.**

**No. 98–2313.**

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1999.

Decided July 6, 1999.

**ARGUED:** Andrew Zane Schwartz, Foley, Hoag & Eliot, L.L.P., Boston, Massachusetts, for Appellant. Wade H. Hargrove, Brooks, Pierce, Mclendon, Humphrey & Leonard, L.L.P., Raleigh, North Carolina; Reid L. Phillips, Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Stephen B. Deutsch, Richard W. Benka, Richard M. Brunell, Foley, Hoag & Eliot, L.L.P., Boston, Massachusetts; W. Andrew Copenhaver, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Winston–Salem, North Carolina, for Appellant. Jennifer K. Van Zant, Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, North Carolina, for Appellee.

Before WILKINSON, Chief Judge, and WIDENER and MOTZ, Circuit Judges.

Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WIDENER and Judge MOTZ joined.

## OPINION

WILKINSON, Chief Judge:

PrimeTime 24, a satellite television carrier, enrolled thousands of subscribers in the Raleigh–Durham area to receive transmissions of network television programs from other cities. ABC, Inc., the owner of the local ABC network affiliate and of copyrights in ABC network programming, sued for copyright infringement under the Satellite Home Viewer Act of 1988 (SHVA), Pub.L. No. 100–667, 102 Stat.3949 (as amended). Finding that PrimeTime had engaged in a pattern or practice of infringing ABC's copyrights, the district court enjoined PrimeTime from transmitting ABC network programs to households in ABC's Raleigh–Durham market. We affirm. We also vacate as moot the district court's judgment against PrimeTime for violating the reporting provisions of the Act.

### I.

The rapid growth of the satellite television industry in the 1980s raised tensions between the purveyors of this nascent technology and the network broadcasting industry. In particular, some satellite carriers began to take network programming from across the country and resell it to owners of satellite dishes. This service had the salutary effect of providing network programming to remote areas that otherwise could not receive it. In areas where local television network affiliates were able to provide service, however, the satellite carriers threatened those affiliates' viability. Moreover, the carriers often transmitted these signals without paying the networks for them. H.R.Rep. No. 100–887(II), at 10–15, 19–20 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5638–5644, 5647–5649

Congress crafted the SHVA in an effort to reconcile these competing interests—providing network television service to remote areas,protecting the networks' interest in their copyrighted material, and

preserving the public interest in the maintenance of a system of local network affiliates. *Id.* The SHVA gives satellite carriers a limited statutory license to re-transmit network signals without securing the networks' consent. 17 U.S.C. § 119(a)(2)(A), (B). Because this license is in derogation of the networks' copy-rights, however, Congress limited its scope. The license extends only to trans-missions to private households that are "unserved" by affiliates of those net-works. *Id.* § 119(a)(2)(B). The SHVA also requires satellite carriers to furnish monthly lists of their subscribers to the networks, *id.* § 119(a)(2)(C),and to pay royalties for each subscriber, *id.* § 119(b).

PrimeTime asserts that it has taken care to ensure that it transmits its signals only to unserved households. Before enrolling a potential subscriber PrimeTime asks that customer whether he can receive an acceptable over-the-air network television picture with a conventional rooftop anten-na. If the potential subscriber answers negatively—and satisfies several other re-quirements—PrimeTime considers him to be eligible for service under the SHVA.

In addition, if a network challenges a subscriber's eligibility to receive satellite transmissions—as it had a right to do from 1994 through 1996 under the SHVA's tran-sitional rules for signal intensity measure-ments, 17 U.S.C. § 119(a)(8) (expired)—PrimeTime sends that subscriber a letter and questionnaire. The questionnaire asks the subscriber about the quality of his television reception (clear, snowy, ghost-ing, sparkles, or lines), the factors that may affect that quality (hills and valleys, trees, weather, buildings, and structures), and whether he has a conventional rooftop antenna. If PrimeTime then determines the subscriber to be ineligible for service, or if the subscriber fails to return the questionnaire, PrimeTime terminates the challenged service.

Finally, in 1997 and 1998 PrimeTime sent questionnaires to every subscriber in the Raleigh–Durham area located in a zip code within ABC's "predicted Grade B contour"—a circular region of approxi-mately 75–mile radius, at the outer edge of which fifty percent of the customers are estimated with fifty percent accuracy to receive a broadcast signal of Grade B in-tensity fifty percent of the time. Prime-Time again screened for eligibility using those questionnaires.

ABC contends that PrimeTime's screen-ing procedures are inadequate. The com-pany thus asserts that PrimeTime engaged in copyright infringement by transmitting network broadcast signals to customers who are not "unserved" within the mean-ing of the SHVA. ABC further claims that PrimeTime failed to submit complete, timely customer lists as required by the statute.

In January 1997 ABC filed this action in the United States District Court for the Middle District of North Carolina. On ABC's motion for summary judgment the district court found that PrimeTime could not meet its burden of proving that its customers were "unserved house-holds." The court held that PrimeTime's conduct constituted a repeated pattern or practice and that the carrier had not completely satisfied the SHVA's reporting require-ments. *ABC, Inc. v. PrimeTime 24, Joint Venture,* 17 F.Supp.2d 467 (M.D.N.C.1998) (*PrimeTime I* ). The district court en-joined PrimeTime from transmitting ABC network television signals to all households in the local market of the network's Ra-leigh–Durham affiliate, WTVD. The court defined this market as the area within WTVD's predicted Grade B contour. *ABC, Inc. v. PrimeTime 24, Joint Ven-ture,* 17 F.Supp.2d 478 (M.D.N.C.1998) (*PrimeTime II* ). PrimeTime appeals.

II.

A.

■ The SHVA defines an "unserved household" for a network affiliate as one that

(A) cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission) of a primary network station affiliated with that network, and

(B) has not, within 90 days ..., subscribed to a cable system.

17 U.S.C. § 119(d)(10). PrimeTime bears the burden of proving that it transmits only to unserved households. *Id.* § 119(a)(5)(D).

PrimeTime contends that it presented volumes of evidence showing that its customers were unserved households as defined by the SHVA. PrimeTime insists that it enrolls no one for service before obtaining an assurance that their household cannot "receive an acceptable over-the-air picture with a conventional rooftop antenna." The carrier further offers the responses its subscribers sent to its written questionnaires. But PrimeTime's evidence, voluminous though it is, shows only that its subscribers were unhappy with the quality of their conventional television pictures. Such subjective assessments of picture equality are simply irrelevant to the question of eligibility for satellite service under the SHVA.

The very terms of the SHVA define eligible households by means of an objective, measurable standard. As noted, PrimeTime's statutory license permits it to transmit a network's signals only to those households that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of grade Intensity (as defined by the Federal Communications Commission)."17 U.S.C. § 119(d)(10). A customer's eligibility for service hinges only upon his ability to receive an over-the-air network signal of the specified strength—according to the FCC,

56 dBu for the channel used by the Raleigh–Durham ABC affiliate. 47 C.F.R. § 73.683; Satellite Delivery of Broadcast Signals under the Satellite Home Viewer Act, 64 Fed.Reg. 7113, 7115, 7117–19 (Feb. 12, 1999) (FCC Final Rule). The statute does not grant satellite carriers a license to transmit network signals to every household that, for whatever reason, considers its picture quality to be "unacceptable."

The legislative history only confirms this conclusion. *See, e.g.,* H.R. Rep. No. 100–887(I), at 15, *reprinted in* 1988 U.S.C.C.A.N. 5577, 5618 ("In essence, the statutory license for network signals applies in areas where the signals cannot be received via rooftop antennas or cable."); H.R.Rep. No. 100–887 (II), at 19, reprinted in 1988 U.S.C.C.A.N. 5648 ("The bill confines the license to the so-called 'white areas,' that is, households not capable of receiving the signal of a particular network by conventional rooftop antennas...."). When explaining the unserved household restriction Congress spoke not of picture quality, but rather of the strength of the television signal a household is capable of receiving.[1]

Two federal agencies have offered the same analysis. *See* U.S. Copyright Office, A Review of the Copyright Licensing Regimes Covering Retransmission of Broadcast Signals 127–28 (Aug. 1, 1997)(rejecting PrimeTime's request to substitute a "subjective" picture quality standard for the existing "objective" Grade B signal intensity standard); FCC Final Rule, 64 Fed.Reg. at 7117 ("By incorporating the objective Grade B signal intensity standard into the SHVA, Congress declined to account for viewers' individual subjective opinions about the quality of their television reception ....") (declining to revise

---

1. PrimeTime makes much of a reference in the legislative history to customer questionnaires. *See* H.R. Rep. No. 100–887(I), at 19 (suggesting "customer questionnaires, sample site signal measurements, and periodic audits" as possible components of a carrier's "internal compliance program"). The suggestion that a carrier might use questionnaires to monitor its own compliance, however, does not undermine the Act's focus on television signal anemia as the *sine qua non* of satellite service eligibility.

the Grade B standard). These interpretations of the SHVA are consistent with our conclusion that a carrier must satisfy an objective standard in order to prove compliance with the Act.

■ This need not mean, as PrimeTime suggests, that a satellite carrier must conduct actual signal strength tests at the home of every subscriber in order to satisfy its burden of proof under the SHVA. Under section 119 the carrier must simply show, more likely than not, that a customer cannot receive a signal of Grade B intensity by use of a conventional rooftop antenna. Individual signal strength tests, predictive computer models, or statistical analyses based on sample signal strength tests might satisfy this burden—if conducted using a reliable method. In fact, the FCC has recently endorsed a model for use in predicting signal strength at individual households. *See* FCC Final Rule, 64 Fed.Reg. at 7121-24. The statute requires, however, that a carrier present objective evidence that its subscribers meet the statutory definition of "unserved household"—and this PrimeTime did not do.

It is true that PrimeTime's evidence did include the results of a few signal strength tests that an expert witness conducted for the carrier. But the expert detected a signal of Grade B or greater intensity at nine of fourteen households tested within ABC's local market, leaving PrimeTime with objective evidence that only five of its more than nine thousand subscribers within that market were actually unserved. The district court correctly found this evidence to "fall[ ] woefully short" of carrying PrimeTime's burden of proof. *PrimeTime I,* 17 F.Supp.2d at 474.

In sum, PrimeTime failed to present sufficient relevant evidence tending to show that its customers were eligible for network service under the SHVA. Given this failure of proof, the district court properly determined that the transmission of network signals to those households did not fall within the SHVA's license.

### B.

■ The transmission of network signals to ineligible households constitutes copyright infringement if it is "willful or repeated." 17 U.S.C. § 119(a)(5)(A), (B). The district court held that PrimeTime's unlicensed transmission of network signals was, at the least, "repeated."*PrimeTime I,* 17 F.Supp.2d at 475-76. PrimeTime contends that this was error.

For unlicensed transmissions to be "repeated" within the meaning of the SHVA, the satellite carrier must have acted with gross or aggravated negligence. *See* H.R. Rep. No. 100–887(I), at 21, reprinted in 1988 U.S.C.C.A.N. at 5624 ("The words 'willful or repeated' are used in the same context in section 119(a) as the words are used in section 111(c)."); H.R. Rep. No. 94–1476, at 93, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5708 (discussing section 111(c), "'Repeated' does not mean merely 'more than once,' of course; rather, it denotes a degree of aggravated negligence which borders on willfulness.").

PrimeTime's conduct certainly met this standard. PrimeTime knew that household eligibility under the SHVA was governed by an objective standard. Indeed, the company lobbied Congress and the Copyright Office for a subjective picture quality standard before and after the passage of the Act. It sent a mailing urging subscribers to call their representatives and "[t]ell them people deserve access to satellite network television if they have a 'poor quality picture,' not if their television signal meets some technical legal standard"; and it established a telephone hotline with a message that stated "Under the current law, your ability to view satellite network TV is based upon the intensity of the signal you receive from your local station, not based upon the quality of the picture on your TV set." Nevertheless, in gross disregard of this standard, PrimeTime recruited subscribers solely on the

basis of their subjective representations as to the quality of their television picture.

PrimeTime argues that it could not have known before the district court's decision in this case that signal strength tests were required before enrolling a subscriber for service. But we do not hold that such preenrollment tests are invariably required. We note only that a carrier must employ some objective screening method to ensure compliance with the Act—a duty that PrimeTime utterly failed to meet. To rely exclusively upon subscribers' subjective impressions of picture quality as its method of complying with the Act was not, as Prime-Time claims, an act of good faith, but rather was to engage in wishful thinking.[2]

### III.

■ We turn now to the question of remedy. Under the SHVA, if a satellite carrier is found to have engaged in a willful or repeated "pattern or practice" of transmission to households that are not unserved, and

> if the pattern or practice has been carried out on a local or regional basis, the court shall order a permanent injunction barring the secondary transmission, for private home viewing in that locality or region, by the satellite carrier of the primary transmissions of any primary network station affiliated with the same network....

17 U.S.C. § 119(a)(5)(B)(ii). Since Prime-Time could prove that virtually none of its thousands of subscribers in the Raleigh–Durham market was eligible for satellite service, the district court held—and we agree—that the carrier had engaged in a "pattern or practice" of infringement.

■ Having thus found a repeated pattern or practice of violations in the market of ABC's Raleigh–Durham affiliate, the district court further held that section 119(a)(5)(B)(ii) required it to enjoin Prime-Time's transmission of ABC programming in that local market. The court barred PrimeTime from making such transmissions to any household within WTVD's predicted Grade B contour. PrimeTime challenges the scope of this injunction.

Citing *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), Prime-Time contends that the district court retains some discretion to shape its injunction, in spite of the Act's use of the word "shall." The carrier points out that the district court's injunction will prevent it from supplying ABC network television to those households within WTVD's predicted Grade B contour that are in fact "unserved." PrimeTime urges that the district court should have more carefully tailored its injunction to avoid affecting these unserved households—"for example," the carrier suggests, "by grandfathering existing subscribers."

We disagree. The SHVA unequivocally commands that when a carrier engages in a willful or repeated pattern or practice of violations in a locality, the district court "shall order" an injunction barring the transmission of network signals "in that locality." 17 U.S.C. § 119(a)(5)(B)(ii). By contrast, conduct that does not rise to the level of a pattern or practice of infringement is subject only to ordinary copyright remedies, 17 U.S.C. § 119(a)(5)(A), which anticipate the full exercise of the discretion of the district court, *id.* § 502 (a court "may ... grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright"). Through deliberate

---

**2.** PrimeTime also raises a number of affirmative defenses—waiver, estoppel, and unclean hands—which the district court rejected. As we explain *infra* in part III, it does not appear that the SHVA grants courts the discretion to consider equitable defenses as such. Considered to rebut the claim that PrimeTime's in-

fringement was "willful or repeated," however, the carrier's allegations fail to excuse its conduct. For the reasons carefully set forth by the district court, we reject PrimeTime's arguments. *See PrimeTime II,* 17 F.Supp.2d at 483–86.

selection of an alternate, stricter remedy for the more serious pattern or practice cases and through its use of the mandatory "shall," Congress has "made its desire plain" to limit the district court's discretion in these circumstances. *Hecht Co.*, 321 U.S. at 330, 64 S.Ct. 587. Having found that PrimeTime engaged in a willful or repeated pattern or practice of violations in the Raleigh–Durham area, the only thing left for the district court to do was to issue the injunction mandated by the SHVA.

The statute and its legislative history also make clear that the injunction shall include the area within the local affiliate's predicted Grade B contour. Although the SHVA does not define the term "locality," the House committee report expresses the intent that the smallest area of relevance should be the network affiliate's local market. H.R. Rep. No. 100–887(I), at 18. And when in 1994 Congress amended the Act to define the term "local market" as "the area encompassed within a network station's predicted Grade B contour," 17 U.S.C. § 119(d)(11), it expressed the intent that the area within an affiliate's predicted Grade B contour be the "only relevant area" for the purposes of local pattern or practice liability. H.R. Rep. No. 103–703 (1994), *available in* 1994 WL 454551.

It is true that the injunction the statute requires may prevent PrimeTime from transmitting network signals to households within WTVD's Grade B contour that would otherwise be eligible for service under the SHVA. But this statute was a compromise among a number of competing interests, and the statutory text defines the terms of the legislative deal. The SHVA grants satellite carriers a license to broadcast to a limited range of households.

In exchange, the Act ensures remedies for the infringement of network copyrights. And where a carrier flouts the terms of its license in a willful and widespread manner, the penalty is a strict one. This scheme is not inconsistent with the underlying purposes of the Act.[3]

## IV.

The district court's injunction hardly brings matters to a standstill. PrimeTime and ABC remain free to negotiate a private agreement for the transmission of network signals. Moreover, if PrimeTime believes the terms of this statute are too harsh it may seek relief in Congress. Indeed, revisions to the SHVA are under consideration in the current legislative session. *See* H.R. 1554, 106th Cong. (1999). Nor do we believe that individual unserved households need become victims in this high-stakes warfare between the television networks and the satellite carriers. Inasmuch as the district court's injunction only applies to PrimeTime, those households may subscribe to receive satellite transmissions from other carriers.

What PrimeTime may not do is pursue the course it followed—signing up thousands of subscribers without making any attempt to ensure compliance with its statutory license. We therefore affirm the judgment of the district court. In addition, because ABC's reporting claims are now moot, we vacate the district court's judgment with regard to those claims.

*AFFIRMED IN PART AND VACATED IN PART*

---

**3.** PrimeTime also challenges the district court's conclusion that its subscriber reports—which were "occasionally" late and incomplete—violated the reporting provisions of the SHVA. *PrimeTime I,* 17 F.Supp.2d at 477–78; *see* 17 U.S.C. § 119(a)(3) (stating that the "willful or repeated" transmission of network signals "is actionable as an act of infringement" where the satellite carrier has failed to satisfy the SHVA's reporting requirements). We need not address this claim. The injunction barring PrimeTime's transmission of network signals renders unnecessary an injunction mandating compliance with the Act's reporting provisions—the only relief ABC requested. We therefore vacate as moot the district court's judgment with regard to PrimeTime's reporting violations.