219 F.3d 92 (2nd Cir. 2000)
 PRIMETIME 24 JOINT VENTURE, Plaintiff-Appellant,
v.
NATIONAL BROADCASTING COMPANY, INC., ABC, INC., CBS, INC., FOX BROADCASTING COMPANY, NATIONAL ASSOCIATION OF BROADCASTERS, NBC TELEVISION AFFILIATES, ABC TELEVISION AFFILIATES ASSOCIATION, CBS TELEVISION
NETWORK AFFILIATES ASSOCIATION, KPAX COMMUNICATIONS, INC., and BENEDEK BROADCASTING CORPORATION, Defendants-Appellees.
 Docket No. 98-9392
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 (Argued: May 3, 1999)
(Decided: July 07, 2000)
 
 Appeal from an order of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) dismissing appellant's antitrust claims on the ground that appellees' conduct had Noerr-Pennington immunity. We reverse.
 HARRY FRISCHER, Solomon, Zauderer, Ellenhorn, Frischer & Sharp (Louis M. Solomon, Jonathan D. Lupkin, of counsel), New York, New York, for Plaintiff-Appellant.
 CHARLES F. RULE, Covington & Burling, Washington, D.C. (Neil K. Roman, Jonathan Galst, Covington & Burling; Eric Seiler, Friedman Kaplan & Seiler LLP, New York, New York, of counsel), for Defendants-Appellees.
 Before: : WINTER, Chief Judge, JACOBS, Circuit Judge, and SWEET, District Judge.*
 WINTER, Chief Judge:
 
 
 1
 This appeal arises out of an antitrust action brought by PrimeTime 24 Joint Venture ("PrimeTime") against the major television networks, their affiliates' trade associations, independent television stations, and the National Association of Broadcasters. The complaint alleged that appellees violated Section 1 of the Sherman Act, 15 U.S.C. § 1, through concerted, baseless, signal-strength challenges brought under the Satellite Home Viewer Act, 17 U.S.C. § 119 (1995), and through a concerted refusal to license copyrighted television programming to PrimeTime. Judge McKenna granted appellees' motion to dismiss under Fed. R. Civ. P. 12(b)(6) on the ground that their conduct was protected under the Noerr-Pennington doctrine. We reverse.
 
 BACKGROUND
 
 2
 The complaint alleged the following. PrimeTime retransmits network broadcast signals either directly to satellite dish owners or to direct-to-home satellite distributors who include the network broadcasts in packages of hundreds of channels sold to consumers. When the complaint was filed, PrimeTime was the leading American provider of network television broadcasts to satellite dish owners. It had over two million subscribers and was the "only satellite carrier of network programming . . . neither owned nor controlled by network or cable television interests."
 
 
 3
 Appellees are the major television networks, ABC, Inc. ("ABC"), CBS, Inc. ("CBS"), the National Broadcasting Company ("NBC"), and the Fox Broadcasting Company ("Fox"); their affiliates' trade associations; the National Association of Broadcasters ("NAB"); and businesses owning and/or operating stations affiliated with the networks. The network companies both supply the affiliates with programming and distribute it directly to consumers through broadcasts from their owned and operated stations. The NAB is a trade association comprising both the networks and the affiliates.
 
 
 4
 Until recently, consumers received television programming principally through over-the-air broadcasts from stations owned and operated by, or affiliated with, the network companies. This technology, however, limited adequate reception to signals transmitted by relatively nearby stations. New technology has both provided improved reception and multiplied the programming options available to consumers through the introduction of cable and satellite television.
 
 
 5
 Unlike conventional broadcasters that transmit free signals and rely on advertising revenues, satellite operators such as PrimeTime charge users a fee. Users can improve reception or access the satellite system's provision of geographically distant station broadcasts. Access to distant stations allows consumers to avoid local preemptions of network programming; to watch sports, news, or other broadcasts from distant stations; or to take advantage of variations in programming timing caused, for instance, by time-zone differences.
 
 
 6
 Due to its continuing appeal, network programming is essential to the competitive position of satellite operators. However, satellite providers cannot offer copyrighted network television programming without permission or a license. In an effort to balance the networks' copyright interests with consumers' interests in receiving programming through satellites, Congress passed the Satellite Home Viewers Act of 1988 ("SHVA"), Pub. L. No. 100-667, 102 Stat. 3935 (Nov. 8, 1988), codified in 17 U.S.C. § 119 (1995), subsequently amended by Satellite Home Viewer Improvement Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-526 to 1501A-545 (Nov. 29, 1999).[1] The SHVA, inter alia, requires networks to license their signals to satellite broadcasters at a statutorily fixed royalty fee, for distribution to viewers who cannot receive a sufficiently strong over-the-air broadcast signal. See generally id.
 
 
 7
 Specifically, the SHVA mandatory license extends only to households that "cannot receive, through the use of a conventional, stationary outdoor rooftop receiving antenna, an over-the-air signal of . . . Grade B intensity as defined by the Federal Communications Commission," 17 U.S.C. § 119(d)(10)(A), and have not received cable service in the preceding 90 days, 17 U.S.C. § 119(d)(10)(B). See 17 U.S.C. § 119(a)(2)(B). Thus, the SHVA establishes a relatively objective signal-strength rule rather than a subjective rule of reception quality. See id.; see also ABC, Inc. v. PrimeTime 24, 184 F.3d 348, 352 (4th Cir. 1999) ("The very terms of the SHVA define eligible households by means of an objective, measurable standard."); CBS Broadcasting, Inc. v. PrimeTime 24 Joint Venture, 48 F. Supp. 2d 1342, 1355 (S.D. Fla. 1998). The signal-strength rule at issue works by station, so that in a local area where the network affiliates' signals originate from different points, the satellite operator might have statutory rights to licenses for the programming of some but not all networks, e.g., ABC and CBS but not NBC. See 17 U.S.C. §§ 119(a)(2)(B), 119(d)(2)(A).
 
 
 8
 Satellite providers initially designate those households for which they claim a statutory right to serve under the mandatory licensing. Local broadcasters have the right under the SHVA to challenge the satellite operators' estimate of the signal-strength received by the designated households. See id. § 119(a)(8). If the subscriber is "within the predicted Grade B Contour of the station," the satellite operator must either cease providing the disputing broadcaster's channel to the challenged viewers or perform a signal-strength test for that household. Id. § 119(a)(8)(A). If the test shows that the challenged household is adequately served by the challenging stations, the satellite provider must cease providing the programming from that station; if the test shows that the challenged household is not adequately served, the challenging station must reimburse the satellite provider for the cost of conducting the test. See id. § 119(a)(8)(B). If the challenged subscriber is outside the particular station's predicted Grade B Contour, a station cannot force the satellite operator to conduct a signal-strength test. See id. § 119(a)(8)(D). However, the station may conduct its own test of service to a particular household, and, if the test shows that the household is adequately served, the satellite operator must reimburse the station for the cost of the test and terminate service of the station's programming to the household. See id.
 
 
 9
 The statute limits the rights of stations to force a satellite provider to conduct signal-strength tests. In any calendar year, a station may challenge no more than five percent of a satellite provider's subscriber base that existed at the SHVA's effective date. See id. § 119(a)(8)(C). Above the five-percent threshold, a station may challenge service to a household only by conducting its own test, as in the case of households outside the predicted Grade B Contour. See id. § 119(a)(8)(c)(ii).
 
 
 10
 PrimeTime's complaint alleged that appellees, in concert with themselves and with coordination by the NAB, intentionally abused the SHVA's signal-strength challenge provision by filing baseless challenges for the purposeof raising PrimeTime's cost structure and thereby reducing competition from it. PrimeTime alleged in particular that appellees based their challenges on a common NBC subscriber list, despite the fact that PrimeTime had provided different lists to each network. Because network affiliates broadcast from different points, the predicted Grade B Contours as described in the lists differ for each network. The purpose of using an NBC subscriber list, PrimeTime alleges, was intentionally to over-challenge subscribers, i.e., to challenge subscribers outside particular stations' Grade B Contours.
 
 
 11
 The complaint also alleged a concerted refusal to deal in that appellees agreed among themselves not to license content to PrimeTime, notwithstanding the fact that it would be in their interests, acting individually, to do so. Specifically, the complaint alleged that the NAB, bargaining on behalf of appellees, offered a per-viewer license at a price that it believed to be prohibitive. When PrimeTime immediately agreed to negotiate that price, the offer was withdrawn. Subsequently, according to the complaint, appellees engaged in a concerted effort not to deal with PrimeTime, and the NAB copied a letter to its members telling them not to deal with PrimeTime. The complaint further alleged that the networks discouraged their affiliates from dealing with PrimeTime and that none of the networks have dealt with PrimeTime.
 
 
 12
 Finally, the complaint alleged that PrimeTime was injured by appellees because it was forced to drop subscribers due to the number of challenges and the cost of conducting signal-strength tests. The complaint also alleged an adverse effect on competition.
 
 
 13
 In granting a motion to dismiss, Judge McKenna ruled that appellees' actions were protected by the Noerr-Pennington doctrine. See PrimeTime 24 Joint Venture v. National Broadcasting Co., 21 F. Supp. 2d 350, 357, 359 (S.D.N.Y. 1998); see generally Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965). It noted that litigation to enforce a valid copyright was protected activity under Noerr-Pennington. See id. at 356 (citing Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 161 (3d Cir. 1984) (holding good-faith litigation to enforce a copyright protected under Noerr-Pennington)). Comparing the use of SHVA-authorized signal-strength challenges to pre-litigation "threat letters," the district court held that concerted use of the statutory challenges was, by extension, protected petitioning activity under Noerr-Pennington. Id. at 356-57. The district court believed that "the case for immunity is particularly strong in this context, considering that the challenged conduct was engaged in as part of a statutory system of monitoring and enforcing defendants' rights under the Copyright Act." Id. at 357. The court also held that the allegations of excessive, willful misuse of the SHVA signal-strength testing provisions did not fall within the sham exception to Noerr-Pennington. See id. at 359-60. In determining that PrimeTime had not adequately alleged facts constituting a "sham" under Noerr-Pennington, the court stated that appellant "fail[ed] to allege . . . that the use of the NBC list was unreasonable under the circumstances or that defendants knew that challenges based on this list would be meritless." Id. at 360.
 
 
 14
 As to the concerted refusal to deal claim, the district court concluded that the complaint's allegations showed only a rejection of a settlement offer and was thus also petitioning activity protected under Noerr-Pennington. See id. at 357-59. In the district court's view, appellees "were under no obligation to negotiate with or grant a license to [PrimeTime] to enable it to retransmit copyrighted network programming." Id. at 358. The court reasoned that PrimeTime's "offers to 'negotiate' with [appellees] . . . were attempts to avoid liability for infringing [appellees'] copyrights" and thus petitioning activity protected under Noerr-Pennington. Id.
 
 
 15
 We note that other courts have determined that "PrimeTime ha[s] engaged in a pattern or practice of infringing [network] copyrights." ABC, 184 F.3d at 350; accord CBS, 48 F. Supp. 2d at 1357. The Florida action resulted in a nationwide injunction against PrimeTime. See CBS, 48 F. Supp. 2d at 1360-63. The district court in the instant matter stated that the success of the Florida action, "while not alone determinative of the merit of their pre-suit challenges, does help to refute any claim of baselessness [in the sham allegation]." PrimeTime, 21 F. Supp. 2d at 360.
 
 
 16
 This appeal followed.
 
 DISCUSSION
 
 17
 We review de novo a district court's dismissal of a complaint under Rule 12(b)(6). See, e.g., McClellan v. Cablevision of Conn., Inc., 149 F.3d 161, 164 (2d Cir. 1998). Generally, "[i]n reviewing the dismissal of a complaint under Rule 12(b)(6) . . . we must accept as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 43 (2d Cir. 1997).
 
 
 18
 PrimeTime makes two straightforward antitrust claims: first, that appellees engaged in coordinated efforts to make baseless SHVA challenges to impose costs upon PrimeTime as a way of stifling competition from it; and, second, that appellees engaged in a concerted refusal to negotiate copyright licenses with PrimeTime, also as a means of stifling competition.
 
 
 19
 a) Abuse of SHVA Challenge Provision
 
 
 20
 It is beyond question that a good-faith SHVA challenge by a station to a PrimeTime subscriber within that station's Grade B Contour cannot violate the Sherman Act. That is what the SHVA specifically permits. Nor do we think that it violates the Sherman Act for stations to act in coordination, whether orchestrated by the networks, NAB, or trade associations, in making good-faith SHVA challenges.
 
 
 21
 We reach that conclusion for two overlapping reasons. First, we believe that Congress intended to allow coordinated efforts among parties such as appellees in making good-faith SHVA challenges, and it would therefore be anomalous to read the Sherman Act to forbid such efforts. Second, even if we were in doubt as to Congress's precise intent, we believe that good-faith SHVA challenges are protected by the Noerr-Pennington doctrine. However, we also conclude that Congress did not intend to permit coordinated SHVA challenges to be made without regard to the merits and for the purpose of imposing upon a satellite carrier unnecessary costs as a means of limiting that carrier's ability to operate and compete. Such bad faith conduct also falls within the "sham" exception to Noerr-Pennington.
 
 
 22
 Turning first to Congress's intent with regard to the SHVA, we note that SHVA challenges are a form of copyright enforcement. The SHVA was designed to "balance[] the rights of copyright owners by ensuring payment for the use of their property rights, with the rights of satellite dish owners, by assuring availability at reasonable rates of retransmitted television signals." H.R. Rep. No. 100-887(I), at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 5611, 5617. Signal-strength challenges are an integral part of the SHVA's design to protect networks' copyright interests and to "respect[] the network/affiliate relationship and promote[] localism." Id.; see generally 17 U.S.C. § 119(a). In its discussion of Section 119(a), the Report of the House Judiciary Committee specifically contemplated cooperation among stations:
 
 
 23
 The [SHVA] contemplates that network stations will cooperate with one another (and with the network with which they are affiliated) in monitoring the compliance of satellite carriers with the requirements of [the SHVA].
 
 
 24
 H.R. Rep. No. 100-887(I), at 19 (1988), reprinted in 1988 U.S.C.C.A.N. 5611, 5622. Noting "the expense and burden of monitoring the eligibility of thousands of individual households scattered across the nation," the Committee Report asserted that this cooperation would "help to preserve the exclusive distribution system" and would "generally be procompetitive." Id. Although the language quoted was limited to intra-network cooperation, the same passage later used more inclusive language: "Absent any anti-competitive ancillary restraints, cooperation among network stations, networks, and satellite carriers in achieving compliance with [the SHVA] will serve the public interest and will provide an efficient method to achieve the ends of the copyright law and [the SHVA]." Id. at 20 (1988), reprinted in 1988 U.S.C.C.A.N. 5611, 5623.
 
 
 25
 These signs of congressional intent are confirmed by the Sherman Act itself, which has been read not to prohibit parties with common legal rights--for example, creditors, see Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1052-53 (2d Cir. 1982)--from engaging in coordinated efforts to enforce those rights. We note that, in particular, the Sherman Act has been read not to limit copyright owners from defending their individual copyrights against common infringers through concerted litigation, even though the owners and infringers may all be competitors. See Redd Horne, 749 F.2d at 161; Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285, 290-91 (10th Cir. 1974); Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F.2d 705, 711 (7th Cir. 1972). Although such decisions have usually relied upon a Noerr-Pennington rationale, traditional antitrust analysis leads to the same outcome. No one but a copyright violator can gain by denying to copyright holders the right to engage in cooperative efforts to enforce their copyrights against a common infringer. Where common legal or fact issues exist, the sharing of costs or other coordinated activity avoids wasteful duplication of effort and has no discernible effect on lawful competition.
 
 
 26
 Of course, the principle that enforcement of legal rights through coordinated efforts among competitors cannot lead to antitrust liability does not extend to the concerted assertion of baseless claims with the intent of imposing costs on a competing firm to prevent or impair competition from that firm. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 516 (1972); Robert H. Bork, The Antitrust Paradox 347-64 (1978). Such conduct is predatory, without any redeeming efficiency benefitting consumers. However, because most of the pertinent caselaw arose under the Noerr-Pennington doctrine, we defer further discussion until immediately infra. Moreover, as we also discuss infra, while owners of copyrights may individually refuse to deal with a party seeking a license, such owners may not collectively refuse to deal to prevent competition. See Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc., 441 U.S. 1, 19 (1979) ("[T]he copyright laws confer no rights on copyright owners to fix prices among themselves or otherwise to violate the antitrust laws . . . ."). We see no hint in the SHVA that Congress intended to relieve appellees of these antitrust limitations on their conduct. Indeed, the House Report quoted above specifically exempted "anti-competitive ancillary restraints" from the SHVA's protection of cooperative enforcement efforts. H.R. Rep. No. 100-887(I), at 20 (1988), reprinted in 1988 U.S.C.C.A.N. 5611, 5623.
 
 
 27
 We turn now to the pertinent analysis under the Noerr-Pennington doctrine, a body of caselaw constituting a limitation upon the scope of the Sherman Act. The doctrine was first established in the context of concerted petitions for anti-competitive legislation. See Noerr, 365 U.S. at 136-38 (right to petition legislature is protected irrespective of whether ends sought promote competition); Pennington, 381 U.S. at 669-71. Having noted in Noerr the "important constitutional questions" implicated by the right to petition the legislature, 365 U.S. at 138, the Supreme Court later made explicit its reliance on First Amendment principles--albeit as an interpretation of the Sherman Act itself--in extending Noerr to apply to concerted actions before courts and administrative agencies. See California Motor Transp., 404 U.S. at 508, 510-11 ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts . . . .").
 
 
 28
 Courts have extended Noerr-Pennington to encompass concerted efforts incident to litigation, such as prelitigation "threat letters," see McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1560 (11th Cir. 1992) (holding that concerted threats of litigation are protected under Noerr-Pennington); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367-68 (5th Cir. 1983) (same); Barq's Inc. v. Barq's Beverages, Inc., 677 F. Supp. 449, 452-53 (E.D. La. 1987) (applying prelitigation rights to enforcement of trademark litigation), and settlement offers, see Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc., 944 F.2d 1525, 1528-29 (9th Cir. 1991), aff'd, 508 U.S. 49 (1993). Litigation, including good faith litigation to protect a valid copyright, therefore falls within the protection of the Noerr-Pennington doctrine. See Redd Horne, 749 F.2d at 161; Colorado Magnetics, 497 F.2d at 290; Alberto-Culver, 466 F.2d at 711.
 
 
 29
 PrimeTime is of course correct in arguing that SHVA challenges are not literally petitions to the government. Moreover, SHVA signal-strength challenges differ significantly from prelitigation threat letters because SHVA challenges require the satellite carrier either to pay for a signal-strength test or to terminate service. SHVA challenges are, therefore, more immediately harmful to a competitor than are prelitigation threat letters. Nevertheless, SHVA challenges are a form of action authorized by statute and a preliminary step to resort to litigation if necessary. Moreover, the immediate harm has been counterbalanced by a statutory right of reimburseement if the challenge is unsuccessful--a litigation skirmish in miniature. Accordingly, we see no reason to exclude SHVA challenges from the protection afforded by Noerr-Pennington generally to administrative and court proceedings or to steps preliminary to such proceedings.
 
 
 30
 However, that is not the end of the matter. The Noerr-Pennington doctrine does not extend to "every concerted effort that is genuinely intended to influence governmental action," because "[i]f all such conduct were immunized then, for example, competitors would be free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports." Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 503 (1988) (holding Noerr-Pennington inapplicable to concerted effort to influence private organization's product standards routinely adopted by state and local governments); see also FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 424-25 (1990) (holding Noerr-Pennington inapplicable to lawyers' boycott aimed at increasing statutory compensation).
 
 
 31
 In particular, as noted in Noerr itself, "[t]here may be situations in which [petitioning activity], ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144. Elaboration of the "sham exception" occurred in California Motor Transport, where the Court noted that "a pattern of baseless, repetitive claims may . . . lead[] the factfinder to conclude that the administrative and judicial processes have been abused." 404 U.S. at 513, 92 S.Ct. 609.
 
 
 32
 To establish "sham" administrative or judicial proceedings, a plaintiff must show that the litigation in question is: (i) "objectively baseless," and (ii) "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process--as opposed to the outcome of that process--as an anticompetitive weapon." Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 60 (1993) (citations, internal quotation marks, and alterations omitted).
 
 
 33
 This two-step inquiry, however, applies to determining "whether a single action constitutes sham petitioning." USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir. 1994) (interpreting Professional Real Estate). In cases in which "the defendant is accused of bringing a whole series of legal proceedings," the test is not "retrospective" but "prospective": "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" Id. As the Ninth Circuit has noted, it is immaterial that some of the claims might, "as a matter of chance," have merit. The relevant issue is whether the legal challenges "are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." Id.
 
 
 34
 Under this standard, PrimeTime's complaint stated a valid sham claim. PrimeTime alleged that appellees submitted "simultaneous and voluminous challenges . . . without regard to whether the challenges had merit," Compl. ¶ 41; see also id. ¶ 44 (calling challenges "objectively baseless"). PrimeTime alleged in particular that appellees submitted violations based solely on NBC station lists. See id. ¶ 44. Because network affiliates in a particular area generally transmit from different locations, PrimeTime plausibly alleged that "ABC, CBS, and Fox affiliates challenged thousands of subscribers who did not even receive ABC, CBS, or Fox programming." Id. Furthermore, PrimeTime alleged that appellees submitted numerous challenges to subscribers outside the predicted Grade B Contour. See id. ¶ 45. Although the challenging stations, not PrimeTime, would have the statutory obligation to pay for a signal-strength test outside the Grade B Contour, see 17 U.S.C. § 119(a)(8)(D), PrimeTime alleged that appellees coordinated their efforts to submit huge volumes of challenges simultaneously, see Compl. ¶ 46, and failed to give PrimeTime "information sufficient to determine which of the challenged subscribers resided within the station's predicted Grade B Contour," id. ¶ 47. Moreover, PrimeTime alleges that the appellees' coordinated scheme "was done in order to overwhelm PrimeTime 24 and make it difficult and expensive for PrimeTime 24 to comply with [the] SHVA." Id. ¶ 41.
 
 
 35
 PrimeTime's complaint therefore adequately alleges that the SHVA challenges were "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." USS-POSCO, 31 F.3d at 811. PrimeTime essentially alleges "the filing of frivolous objections . . . simply in order to impose expense and delay," the "classic example" of a sham. City of Columbia v. Omni, 499 U.S. 365, 380 (1991); see also California Motor Transp., 404 U.S. at 512 ("It is alleged that petitioners instituted the proceedings and actions with or without probable cause, and regardless of the merits of the cases." (internal punctuation marks omitted)). Indeed, PrimeTime alleges conduct virtually identical to that deemed by the Ninth Circuit in USS-POSCO to be "automatic petitioning . . . without regard to and regardless of the merits of said petitions," 31 F.3d at 810, that "if proven, would be sufficient to overcome the [defendants'] Noerr-Pennington defense." Id. at 811. PrimeTime's SHVA signal-strength challenges claim should not, therefore, have been dismissed on the pleadings.
 
 
 36
 Appellees also argue that PrimeTime's sham allegation should be dismissed because of the success broadcasters have had in other litigation against PrimeTime. See ABC, 184 F.3d 348; CBS, 48 F. Supp. 2d 1342. For example, in resolving appellees' prior nationwide copyright action against PrimeTime, the District Court for the Southern District of Florida rejected PrimeTime's "unclean hands" defense, which included many of the allegations PrimeTime proffers in support of its sham claim. See CBS, 48 F. Supp. 2d at 1359. However, all that was determined in the Florida action was that PrimeTime engaged in a pattern and practice of violating the networks' copyrights, see id. at 1357, and should therefore be enjoined. The rejection of the "unclean hands" defense involved an equitable weighing of PrimeTime's conduct against that of some appellees. The court concluded only that the balance was not such as to preclude an injunction against PrimeTime for copyright violation. This balancing hardly compels us to conclude that a properly alleged abuse of SHVA challenges cannot constitute an antitrust violation. Appellees may well have engaged in a "pattern of baseless, repetitive" signal-strength challenges to harm PrimeTime, California Motor Transp., 404 U.S. at 513, even though PrimeTime itself was engaged in a pattern or practice of copyright violations. These arguments appear to go more to the damages suffered by the respective parties than to liability.
 
 
 37
 b) Concerted Refusal to Deal Claim
 
 
 38
 PrimeTime's concerted refusal to deal claim alleged that it attempted to deal individually with each of the affiliated stations, see Compl. ¶ 51, but that "[t]he NAB and other [appellees] organized a campaign to ensure that no affiliate would break ranks and enter into discussions with PrimeTime," id. ¶ 52. PrimeTime further alleged that none of the network-affiliated stations has "engaged in any real negotiation" with PrimeTime, that many have sent identical rejection letters, and that NBC and ABC have specifically discouraged their affiliated stations from dealing with PrimeTime. Id. ¶ 53. PrimeTime alleged "a horizontal agreement among direct competitors," a classic per se violation of the Sherman Act. NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135-36 (1998); see also Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals . . . to deal . . . , have long been held to be [per se antitrust violations].").
 
 
 39
 Appellees assert, and the district court held, that their conduct "amounted to the rejection of settlement offer, which constitutes protected petitioning activity" under Noerr-Pennington, see PrimeTime, 21 F. Supp. 2d at 358. In so holding, the court relied largely on the Ninth Circuit's opinion in Columbia Pictures, 944 F.2d 1525. In that case, plaintiff had alleged that defendants, after they had instituted a copyright infringement action, conspired to frustrate plaintiff's attempts to obtain licenses. See id. at 1527. The court granted summary judgment in favor of the defendants on plaintiffs' concerted refusal to deal claim. See id. at 1528-33. Significantly, the Ninth Circuit ruled that "[o]n the facts of this case, [plaintiff]'s request for licensing amounted to an offer to settle the lawsuit." Id.
 
 
 40
 However, it is hardly clear from the complaint here, including supporting letters and documentation, that PrimeTime's attempts to deal individually with the networks and stations were only "an offer to settle the lawsuit[s]." Although appellees had made the disputed SHVA signal-strength challenges when PrimeTime sought to deal with the networks and stations individually, PrimeTime's initial offer predated the copyright infringement lawsuits. See PrimeTime, 21 F. Supp. 2d at 358-59. Moreover, by proposing to offer each station a fee for each local subscriber, PrimeTime may have been seeking to obtain licenses prospectively, allowing ongoing legal actions to survive. Although coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit. See Broadcast Music, 441 U.S. at 19. Such an agreement would, absent litigation, violate the Sherman Act, see id.; NYNEX, 525 U.S. at 136 (noting that horizontal agreements among competitors are per se antitrust violations (citing Klor's, 359 U.S. at 212-13)), and cannot be immunized by the existence of a common lawsuit.
 
 
 41
 Nothing in the SHVA itself, or its legislative history, suggests a congressional intent to limit the Sherman Act's applicability to such conduct. As noted, although the House Judiciary Committee Report did contemplate cooperation among copyright holders to monitor satellite carriers' compliance with the SHVA, see H.R. Rep. No. 100-887(I), at 19 (1988), reprinted in 1988 U.S.C.C.A.N. 5611, 5622, it specifically stated that the SHVA did not countenance "anti-competitive ancillary restraints," id. at 20, reprinted in 1988 U.S.C.C.A.N. at 5623 ("Although the Committee expects and approves of . . . cooperation in achieving compliance with the [SHVA], any restraints ancillary to such activities would be governed by existing law.").
 
 
 42
 Although the networks and their affiliates compete with each other through common technology, PrimeTime offers similar services through a different technology that is a common competitive threat to the networks and affiliates. A concerted refusal to license copyrighted programming to PrimeTime in order to prevent competition from it is a boycott that, if proven, violates the Sherman Act. See Klor's, 359 U.S. at 212; see also Broadcast Music, 441 U.S. at 19.
 
 
 43
 c) Other Antitrust Elements
 
 
 44
 Because we review the district court's decision to dismiss under Rule 12(b)(6) de novo, we are free to affirm the decision below on dispositive but different grounds. Appellees assert that PrimeTime has failed to allege other essential elements of an antitrust violation. Their arguments are meritless.
 
 
 45
 To make out a Section 1 violation of the Sherman Act, a plaintiff must allege "a combination or some form of concerted action between at least two legally distinct economic entities" that "constituted an unreasonable restraint of trade either per se or under the rule of reason." Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 542 (2d Cir. 1993). In addition, a plaintiff must independently show "antitrust injury," Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990), in order to ensure that "a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." Id. at 344.
 
 
 46
 Appellees argue first that "the SHVA, not [appellees'] conduct, . . . prevents [PrimeTime] from competing with [appellees']." We disagree. The SHVA does not prevent networks and stations from individually licensing their product to satellite carriers; it merely does not force them to do so. Nor does the SHVA force networks and stations to make signal-strength challenges; it merely authorizes them to do so.
 
 
 47
 In addition, PrimeTime has clearly alleged injury both to itself and to competition generally. Specifically, PrimeTime alleges that it "has been injured in its business and property, including by having lost profits and goodwill, by having to incur substantial and unnecessary expenses, and by being seriously weakened, and threatened with elimination . . . ." Compl. ¶ 55. Moreover, PrimeTime plausibly alleges a harm to competition: according to the complaint, appellees' conspiracies both reduced networks' national competition with alternative programming and reduced local stations' competition with alternative distribution systems. See id. ¶ 56. As a result, appellant alleges, "[a]ctual and potential price competition has been eliminated, output has been restricted, . . . and millions of consumers have lost or risk losing the opportunity to receive higher quality television reception and additional programming options." Id.
 
 
 48
 Finally, appellees' argument that appellant lacks antitrust standing because it is not a competitor or customer is unavailing. PrimeTime competes directly with the networks' owned and affiliated stations in distributing network programming and is also clearly a customer of the network defendants.
 
 
 49
 d) State Law Claims
 
 
 50
 Finally, having dismissed the Sherman Act claims, the district court declined to exercise jurisdiction over appellant's pendent State law claims. Because we reinstate the Sherman Act claim, the district court's dismissal of the state law claims must be reversed. See Field v. Trump, 850 F.2d 938, 950 (2d Cir. 1988).
 
 CONCLUSION
 
 51
 We therefore reverse.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert W. Sweet, United States District Judge for the Southern District of New York, sitting by designation.
 
 
 [1]
 Although Congress amended the SHVA in 1999, the acts alleged in the complaint occurred under the prior statute. The subsequent amendments are not relevant to our analysis, and all reference to 17 U.S.C. § 119 in this opinion refers to the prior version of the SHVA.